**UNITED STATES of America,**
**Plaintiff,**

v.

**PARKE, DAVIS & COMPANY,**
**Defendant.**

**Civ. A. No. 1064-57.**

United States District Court
District of Columbia.

July 16, 1958.

Edward R. Kenney, Herbert F. Peters, Jr., Marshall C. Gardner, Department of Justice, Washington, D. C., for plaintiff.

Gerhard A. Gesell, David B. Isbell, Covington & Burling, Washington, D. C., for defendant.

JOSEPH R. JACKSON, District Judge (sitting by designation).[*]

This is a proceeding instituted by the United States under Section 4 of the Act of Congress of July 2, 1890, C. 647, 26 Stat. 209, as amended, and entitled "An act to protect trade and commerce against unlawful restraints and monopolies", commonly known as the Sherman Act. It was brought in order to prevent alleged violations by the defendant, Parke, Davis & Company, of Sections 1 and 3 of the Act (15 U.S.C.A. Sections 1 and 3).

In the Complaint it is stated that the defendant, one of the nation's principal manufacturers and distributors of pharmaceutical products, engaged, with various co-conspirators, distributors of defendant's products, in an unlawful combination and conspiracy to establish, maintain, enhance and fix both wholesale and retail prices on defendant's products in interstate commerce through-

---

[*] A Senior Judge of the United States Court of Customs and Patent Appeals, sitting by designation pursuant to the provisions of § 294(d) of Title 28, United States Code.

out the District of Columbia and the State of Virginia in violation of the hereinabove-named sections of the Act. The alleged co-conspirators were not named as defendants.

Plaintiff prayed that defendant be decreed to have combined and conspired as alleged; that it and all claiming to act in its behalf be perpetually enjoined from carrying out the alleged conspiracy in all respects; and that defendant be enjoined from boycotting, or attempting to boycott, any person, firm or corporation selling or advertising for sale defendant's products below its suggested resale price. Issue was duly joined by Answer of defendant.

At the conclusion of plaintiff's case, counsel for defendant moved under Rule 41(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., to dismiss the Complaint; the Court having considered the briefs of the parties, reviewed the transcript, heard oral arguments, and having concluded, upon the facts and the law, that the plaintiff had shown no right to relief, granted the motion, and judgment was ordered accordingly.

It is apparent to the Court, from the testimony and exhibits, that defendant had well-established policies concerning the prices at which defendant's products were to be sold by wholesalers and retailers, and the type of retailers to whom the wholesalers could re-sell. It appears that defendant sold its products in the above-mentioned territory directly to retailers through its Baltimore branch in quantity lots at prices less than the retailers could buy from the wholesalers— the latter sold to the retailers primarily in smaller quantities.

It further appears that the sale of defendant's products as compared with the overall sales of like or similar products of other pharmaceutical concerns is very small, but that there is keen competition between its products and those of other producers. Fair Trade laws were not in effect either in the State of Virginia or in the District of Columbia during the pertinent period.

The entire record reveals that representatives of defendant notified retailers concerning the policy under which its goods must be sold, but the retailers were free either to do without such goods or sell them in accordance with defendant's policy. Defendant's representatives likewise contacted wholesalers, notifying them of its policy and the wholesalers were likewise free to refuse to comply and thus risk being cut off by the defendant. It may be noted that every visit made by the representatives to the retailers and wholesalers was, to each of them, separate and apart from all others.

The evidence is clear that both wholesalers and retailers valued defendant's business so highly that they acceded to its policy.

It is apparent from what has been said herein that there was no coercion by defendant and no agreement with co-conspirators as alleged in the Complaint. Clearly, the actions of defendant were properly unilateral and sanctioned by law under the doctrine laid down in the case of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. That doctrine continues to be the law.

Counsel for the plaintiff contends vigorously that proof of its allegations is implicit in (1) defendant's calling the attention of both retailers and wholesalers to its policy, and (2) the distributors' acquiescence to the policy. The Court cannot agree to such a nebulous deduction from the record before it.

It was shown that defendant, in the fall of 1956, abandoned in good faith its efforts to maintain minimum resale prices in the involved territory, and, in the Court's opinion, there is no reasonable probability or danger that defendant or any other pharmaceutical company will unilaterally, or with others, strive to fix or to enforce any conditions with respect to the sale of its or their products in the State of Virginia or the District of Columbia. It is clear that, under the long-continuing competitive conditions, neither defendant nor other manufacturer or distributor of like goods could

possibly attempt to do so. If they did, there could be no result other than heavy financial loss.

It is true that the General Counsel of defendant testified that the abandonment of the required sales prices was in some measure concerned with defendant's having learned that the Anti-Trust Division of the Department of Justice was looking into its business, but he stated positively, in effect, that it was not the chief or moving factor in its action of abandonment. It is evident to the Court that the compelling reason for defendant's so doing was forced upon it by business and economic conditions in its field.

■ There can be no doubt from what has been stated herein that, even if the unlawful conditions alleged in the Complaint had actually been proved, since 1956 they no longer existed, and it follows that to enjoin defendant from doing as alleged when there is nothing to enjoin, and no reason to believe, or even surmise, the unlawful acts alleged can possibly be repeated, would be an empty gesture. United States v. Hamburg-Amerikanische etc. Co., 1916, 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387.

In view of the Court's opinion as hereinbefore set forth, there follows its Findings of Fact and Conclusions of Law:

## Findings of Fact

1. The defendant, Parke, Davis & Company (hereinafter referred to as Parke, Davis) is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business at Detroit, Michigan. It transacts business and is found within the District of Columbia. It maintains a branch office at Baltimore, Maryland, to which pharmaceutical products are sent in interstate commerce from its principal plant in Michigan. These products are then distributed in interstate commerce from its Baltimore office to various drug wholesalers and retailers, including drug wholesalers and retailers in the District of Columbia and the State of Virginia. The Baltimore branch office operates in accordance with policies laid down by the Company's home office in Detroit.

2. Parke, Davis manufactures approximately 600 different pharmaceutical products, including both prescription and nonprescription items. In 1956, the total dollar volume of its sales in the District of Columbia and Richmond, Virginia, was as follows:

|  | To Retailers | To Wholesalers |
| --- | --- | --- |
| District of Columbia | $499,304 | $161,247 |
| Richmond, Virginia | $ 58,870 | $113,651 |

3. Parke, Davis' sales constitute less than 5% of the sales of pharmaceutical products in the District of Columbia and Richmond, Virginia. There are about 2,000 different drug manufacturers selling about 178,000 different drug items in the District of Columbia.

4. Plaintiff makes no claim that the prices for Parke, Davis products are not competitive with similar products produced by other pharmaceutical manufacturers. Parke, Davis' products are sold in the District of Columbia and the State of Virginia in intense competition with the products of other manufacturers.

5. Retailers may buy Parke, Davis products either directly from Parke, Davis or from wholesalers. Ordinarily, their large volume purchases are made from Parke, Davis which offers a lower quantity price on some of its products than the wholesalers offer. The wholesalers, on the other hand, provide the retailers the convenience of smaller quantity purchases, day-to-day service, and a wide variety of products of many different manufacturers.

6. During the period covered by the Complaint, there were no Fair Trade laws in effect in either the District of Columbia or the State of Virginia.

7. Suggested minimum resale prices were unilaterally established by Parke, Davis for retailers and wholesalers in the District of Columbia and Virginia and elsewhere, and were published to the trade long before the summer of 1956.

8. The Parke, Davis catalogue for retailers contained the following statement under the heading "Minimum Retail Pricing Applying to Parke, Davis Products"

"The Minimum Retail Prices herein set forth or in the Price Change Supplements applying thereto are in conformity with the provisions of the Fair Trade Laws of the States having such laws and are suggested for use also in those States which have not enacted Fair Trade Laws."

9. The Parke, Davis catalogue for wholesalers contained the following statement under the heading "Wholesale Drug Trade Sales and Distribution Policy"

"It is the continuing policy of Parke, Davis & Company in dealing with wholesalers to sell its products to wholesalers who observe the Net Price Selling Schedule in this Parke, Davis & Company Wholesale Drug Trade Biller's Price List and Supplements, and who confine their distribution of Parke, Davis products, whether Rx legend or non-Rx legend, to customers authorized by law to fill or dispense prescriptions."

10. Parke, Davis did not have any regularized or systematic machinery for maintaining its suggested minimum prices as to either retailers or wholesalers. It did not regularly "shop" stores, maintain card index files, or in any other manner police its suggested minimum prices in either the District of Columbia or Virginia, nor is there any evidence that it sought or obtained the cooperation of retailers or wholesalers in reporting or policing deviations from its suggested minimum prices.

Parke, Davis learned of the price cutting through its salesmen who called at those retail stores which ordered directly from Parke, Davis; the salesmen reporting the cut prices and advertising thereof, due to the complaints of such retailers.

11. In the spring of 1956, Parke, Davis also had a policy of refusing to sell to retailers it deemed to be undesirable customers, including those whose failure to maintain suggested minimum retail prices disrupted the market, and of refusing to sell to wholesalers who sold to retailers who were considered undesirable.

12. For a short time prior to the summer of 1956, there had been minor price cutting by certain retailers in the District of Columbia. Parke, Davis and its wholesalers continued to sell to these retailers until the deep price cutting by retailer Dart Drug Company demoralized the market and caused the Baltimore branch manager to inquire as to a possible remedy at a Branch Managers' meeting at Detroit. This manager, prior to coming to the Baltimore office, had been in a branch which operated only in states having effective Fair Trade laws. At that meeting, he learned for the first time that the Company took the position, upon the advice of counsel, that in a non-Fair Trade area it could unilaterally refuse to sell to retailers who refused to observe the recommended resale prices of the Company. Upon the basis of this information, the manager of the Baltimore branch office stated that he would apply this policy in the District of Columbia, and upon his return he instructed his assistants and the Company's salesmen to inform the trade in the District of Columbia and Virginia that it was the policy of Parke, Davis not to sell to any retailer who sold Parke, Davis products below suggested minimum prices, and not to sell to any wholesaler who, in turn, sold those products to such a retailer. Parke, Davis did not

seek to enter into agreements with anyone, did not instruct its representatives to seek agreements nor authorize them to do so, but merely gave them authority to state the policy and its consequences. These instructions were carried out in July, 1956.

13. When five retailers continued, despite the announcement of Parke, Davis' intentions, to sell Parke, Davis products below the suggested minimum retail prices, Parke, Davis discontinued selling to them and told wholesalers in the District of Columbia and Virginia that it would discontinue selling to them also if they sold Parke, Davis products to those retailers.

14. Parke, Davis brought to the attention of each of the five wholesalers named as co-conspirators in the Complaint the names of several of the retailers who were selling its products at prices below the recommended retail prices. Three of the wholesalers attempted to stop their sales of Parke, Davis products to those retailers in order not to be cut off themselves, although occasionally such products were sold by inadvertence to those retailers. There is no evidence that Parke, Davis solicited any agreement, nor that any of the wholesalers made any agreement with Parke, Davis on this subject.

15. The retailers who were cut off by Parke, Davis because they failed to observe Parke, Davis' suggested minimum retail prices continued nonetheless to advertise such products at cut prices by window displays or newspaper advertisements for the reason that they still had such products in their inventory.

16. Advertising of price cuts by a few retailers in the District of Columbia was, so far as Parke, Davis products were concerned, confined to a few products, mostly certain popular vitamins. In some cases, the prices quoted in the advertisements were below the price at which a small retailer could purchase the same product from Parke, Davis or one of its wholesalers. These advertisements injured the good name and marketability of Parke, Davis' products

generally and resulted in Parke, Davis losing the support and confidence of the great majority of the retailers upon whom it relied for the promotion of its goods. The principal cut-price advertiser, Dart Drug, encouraged customers responding to its advertisements to purchase its own private brand of vitamins, and the proprietor of that concern acknowledged that on occasion its salesmen had switched customers requesting Parke, Davis products to such Dart private brands. This was one of the purposes of cut-price advertising.

17. In the latter part of August 1956, Parke, Davis' representatives separately advised some of the retailers it had cut off, of a change in the policy regarding retail prices, and stated that Parke, Davis would sell its products to them regardless of the prices at which they resold those products, but that Parke, Davis would not sell to them if they advertised price cuts on Parke, Davis' products in the newspapers or on their windows. Parke, Davis then resumed selling its products to each of these retailers, and although these retailers continued to sell Parke, Davis products at cut prices, for a period of one month, there were no newspaper advertisements in the District of Columbia offering Parke, Davis products at cut prices. Parke, Davis neither solicited nor obtained any agreement regarding advertising from any of these retailers.

18. Although advertisements featuring Parke, Davis products at cut prices commenced to appear again in newspapers in the District of Columbia at the end of September 1956, and although the retailers which had ceased such advertising thereafter resumed it, Parke, Davis took no further action with regard to retail prices or advertising, and it continued to sell to all retailers concerned.

19. No witness was called connected with Peoples. The evidence shows that a representative of Parke, Davis advised a representative of Peoples that Parke, Davis would not sell to that company if it did not observe Parke, Davis' sug-

gested prices. The Peoples' representative stated that Peoples would stop cutting prices on Parke, Davis' products and Parke, Davis continued to sell to Peoples. Parke, Davis did not solicit any agreement, and Peoples did not enter into any agreement or understanding of any kind with Parke, Davis concerning prices or advertising.

20. No witness was called connected with Babbitt. There is no evidence that Parke, Davis solicited any agreement, or that Babbitt entered into any agreement or understanding of any kind with Parke, Davis concerning prices or advertising. However, sales to Babbitt were curtailed for a period of time and later resumed.

21. Standard Drug was advised of Parke, Davis' policy and informed that if it continued to cut prices on Parke, Davis products it would be cut off. It made no commitment of any kind to Parke, Davis, it continued to cut prices, and it was cut off for about two weeks. Parke, Davis did not solicit any agreement, and Standard Drug did not enter into any agreement or understanding of any kind with Parke, Davis concerning either prices or advertising.

22. Drug Mart, a group of some 30 independent retail pharmacies in the District of Columbia, engaged in cooperative advertising and purchasing. From time to time, Drug Mart advertised cut prices on Parke, Davis products. Parke, Davis advised Drug Mart that Parke, Davis would refuse to sell to the stores if cut-price advertising of Parke, Davis products continued, and Drug Mart in fact discontinued such advertising for a period of several months. There is evidence that one reason for Drug Mart's discontinuing this advertising was that Parke, Davis advised the organization that it was treating as a discount item certain resale premiums which, under Parke, Davis' sales policies were required to be paid to sales personnel in the various stores, and the buyer for Drug Mart felt he was not interested in promoting Parke, Davis' goods if he could not treat these payments as a discount. Parke, Davis did not solicit any agreement, and Drug Mart did not enter into any agreement or understanding of any kind with Parke, Davis concerning prices or advertising. The evidence shows that each member store of the organization was free to charge whatever prices it wished and to advertise as it wished, regardless of whether there was any joint advertising of Parke, Davis products.

23. Dart Drug was cut off early in July when it continued to sell at cut prices after being advised of the Parke, Davis policy. Sometime later in July, and again in the latter part of August, Parke, Davis' representatives advised Dart Drug that, if that concern advertised Parke, Davis products at cut prices, Parke, Davis would not sell to it, but that if it did not advertise such cut prices, Parke, Davis would sell to it. Dart Drug ceased advertising Parke, Davis' products for a period of two weeks in July, and during this time purchased from Parke, Davis. When it again advertised Parke, Davis refused to sell. Parke, Davis again commenced selling to Dart Drug in August when Dart Drug ceased advertising and continued to do so after Dart resumed advertising two months thereafter. At all times, Dart Drug sold Parke, Davis' products at cut prices in its store, whether or not it was advertising them. Parke, Davis did not at any time solicit an agreement from, or make an agreement with, Dart Drug as to prices or advertising, but rather informed Dart of its policies and acted upon them.

24. State Drug and McReynolds Drug were among the retailers who were cut off by Parke, Davis when they continued to sell Parke, Davis products at cut prices after Parke, Davis' policy had been announced to them. Neither concern individually advertised cut prices in the newspapers, though they did through Drug Mart, an association of independent retailers. While neither one was alleged to have conspired individually with Parke, Davis as to pricing, advertising or any other matter, the Drug Mart group, of which State and McReynolds

were members, was alleged to have conspired with Parke, Davis as to pricing and advertising.

25. No evidence was introduced to show that the discontinuance of advertising by a few retailers for a short period of time had any effect whatsoever on the prices charged to the public for Parke, Davis & Company products.

26. On December 12, 1957, subsequent to the trial of the companion criminal action, Parke, Davis informed Dart Drug Company that it was permanently closing the Dart account and did not intend to have any further dealings with that company. Since that time, Parke, Davis has not sold its products to Dart Drug. There is no evidence, however, that Parke, Davis made any effort to influence the dealings of Dart Drug with the wholesalers, and Dart Drug has continued to purchase Parke, Davis' products from wholesalers in the District of Columbia and to sell and advertise such products at cut prices. Parke, Davis' action in ceasing relations with Dart was a purely unilateral one, and there is no evidence that it had any relation to Dart's prices or advertising policies.

27. In the fall of 1956, Parke, Davis in good faith abandoned and discontinued its efforts to maintain minimum resale prices in the District of Columbia and Virginia through refusals to sell. Since the fall of 1956, and up until the present time, retailers in both areas, including retailers alleged to be co-conspirators, have continuously sold and advertised Parke, Davis products at cut prices, and have been able to obtain those products from both the wholesalers and/or Parke, Davis itself. Parke, Davis has made no efforts to compel the cessation of these practices. There is no proof or indication of any intention on the part of Parke, Davis to resume such efforts. There is no present threat or substantial probability or likelihood that Parke, Davis will attempt, in the District of Columbia or Virginia, to cut off retailers who fail to sell its products at its suggested minimum resale prices, or to cut off wholesalers because they in turn

sell to such retailers. Nor is there any threat or substantial probability or likelihood that Parke, Davis will contract, combine or conspire with others to fix or maintain prices or terms or conditions of sale for its products in the District of Columbia and Virginia.

28. The Complaint also charges that Parke, Davis combined and conspired with five wholesalers to fix the prices at which the wholesalers could resell the products of Parke, Davis. The evidence shows that the wholesalers were familiar with Parke, Davis' policies as stated in Parke, Davis' wholesaler catalogue and had for many years prior to June 1956 observed Parke, Davis' suggested minimum resale prices because they each recognized that if they did not adhere to these prices Parke, Davis would not sell to them and they desired to continue as customers of Parke, Davis. There is no evidence that any of them made any agreement with Parke, Davis as to prices or that Parke, Davis ever solicited an agreement from any of them as to this matter.

29. The evidence shows that in early 1956 Washington Wholesale Drug Exchange, a co-operative, adjusted its practices in billing its customers on Parke, Davis goods so as not to credit any of its accounts with a cash discount on the face of the invoice, when Parke, Davis pointed out that it was crediting for a cash discount without proof that cash had in fact been paid. Its billing practices were inconsistent with the suggested minimum resale price policy of Parke, Davis, which took no action to prevent the granting of cash discounts whenever they had in fact been earned. Under the modified billing procedures, cash discounts were still granted in a different form. The evidence shows that in making this change in its billing practices, Washington Wholesale was merely conforming to Parke, Davis' minimum resale price policy, and did not make any agreement as to price.

30. The Complaint also charges that Parke, Davis combined and conspired with five wholesalers to sell pharmaceu-

tical products only to retailers licensed to fill or dispense prescriptions. The evidence shows that the wholesalers were familiar with Parke, Davis' policy in this respect as stated in Parke, Davis' wholesaler catalogue and had for many years prior to June 1956 refused to sell Parke, Davis' products to non-drug outlets because they each separately recognized that if they did not adhere to this policy, Parke, Davis would not sell to them and they desired to continue as customers of Parke, Davis. There is no evidence that any of them made any agreement with Parke, Davis as to sales to non-drug outlets, or that Parke, Davis ever solicited an agreement from any of them as to this matter.

31. There is no evidence that at any time during the period covered by the Government's proof Parke, Davis ever conferred or discussed its sales policies with more than one wholesaler or more than one retailer at a time, nor that it made the enforcement of its policies as to any one wholesaler or retailer dependent upon the action of any other wholesaler or retailer.

### Conclusions of Law

1. The evidence as a whole does not support the allegations of paragraphs 13 through 16 of the Complaint.

2. Defendant Parke, Davis did not combine, conspire or enter into an agreement, understanding or concert of action with the alleged co-conspirators or anyone else involving the District of Columbia or the State of Virginia to the effect that on sales of pharmaceutical products manufactured by defendant Parke, Davis the wholesaler co-conspirators and retailer co-conspirators would adhere to resale prices fixed by defendant Parke, Davis.

3. Defendant Parke, Davis did not combine, conspire or enter into an agreement, understanding or concert of action with the alleged co-conspirators or anyone else involving the District of Columbia or the State of Virginia to the effect that the defendant and the wholesaler co-conspirators would refuse to sell pharmaceutical products manufactured by defendant Parke, Davis to retailers who did not agree to adhere to resale prices fixed by defendant Parke, Davis.

4. Defendant Parke, Davis did not combine, conspire or enter into an agreement, understanding or concert of action with the alleged co-conspirators or anyone else involving the District of Columbia or the State of Virginia to the effect that the retailer co-conspirators would not advertise pharmaceutical products manufactured by defendant Parke, Davis at prices lower than the resale prices fixed by defendant Parke, Davis.

5. Defendant Parke, Davis did not combine, conspire or enter into an agreement, understanding or concert of action with the alleged co-conspirators or anyone else involving the District of Columbia or the State of Virginia to the effect that the defendant and the wholesaler co-conspirators would refuse to sell pharmaceutical products manufactured by defendant Parke, Davis to retailers who advertised such products at prices lower than the resale prices fixed by defendant Parke, Davis.

6. Defendant Parke, Davis did not combine, conspire or enter into an agreement, understanding or concert of action with the alleged co-conspirators or anyone else involving the District of Columbia or the State of Virginia to the effect that the defendant would induce, coerce and compel wholesalers not to sell pharmaceutical products manufactured by defendant Parke, Davis to retailers who sold or advertised such products at prices lower than the resale prices fixed by defendant Parke, Davis.

7. Defendant Parke, Davis did not combine, conspire or enter into an agreement, understanding or concert of action with the alleged co-conspirators or anyone else involving the District of Columbia or the State of Virginia to the effect that defendant Parke, Davis and the wholesaler co-conspirators would sell pharmaceutical products manufactured by defendant Parke, Davis only to retailers licensed to fill or dispense prescriptions.

8. No violation of Section 1 of the Sherman Act has been shown.

9. No violation of Section 3 of the Sherman Act has been shown.

10. In view of defendant's changed practices and the other facts found by this Court in connection therewith, the awarding of injunctive relief would be neither necessary nor appropriate, even had the defendant, contrary to this Court's findings, been found to have engaged in unlawful price activities.

11. Plaintiff has shown no right to relief upon the facts and law, and defendant's timely motion for dismissal, under Rule 41(b) is granted, and judgment in favor of the defendant shall be entered in accordance with these findings of fact and conclusions of law.