# UNITED STATES *v.* PARKE, DAVIS & CO.

No. 20. Argued November 10, 1959.—Decided February 29, 1960.

30

*Daniel M. Friedman* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Acting Assistant Attorney General Bicks, Richard A. Solomon, Edward R. Kenney* and *Henry Geller.*

*Gerhard A. Gesell* argued the cause for appellee. With him on the brief were *Edward S. Reid, Jr.* and *Weaver W. Dunnan.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The Government sought an injunction under § 4 of the Sherman Act against the appellee, Parke, Davis & Company, on a complaint alleging that Parke Davis conspired and combined, in violation of §§ 1 and 3 of the Act,[1] with

---

[1] The pertinent provision of Sections 1, 3 and 4 of the Act of July 2, 1890, 26 Stat. 209, as amended (15 U. S. C. §§ 1, 3, 4), commonly known as the Sherman Act, are as follows:

"Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . . . Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a misdemeanor . . . ."

"Sec. 3. Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in . . . the District

retail and wholesale druggists in Washington, D. C., and Richmond, Virginia, to maintain the wholesale and retail prices of Parke Davis pharmaceutical products. The violation was alleged to have occurred during the summer of 1956 when there was no Fair Trade Law in the District of Columbia or the State of Virginia.[2] After the Government completed the presentation of its evidence at the trial, and without hearing Parke Davis in defense, the District Court for the District of Columbia dismissed the complaint under Rule 41 (b) on the ground that upon the facts and the law the Government had not shown a right to relief. 164 F. Supp. 827. We noted probable jurisdiction of the Government's direct appeal under § 2 of the Expediting Act.[3] 359 U. S. 903.

Parke Davis makes some 600 pharmaceutical products which it markets nationally through drug wholesalers and

---

of Columbia, or in restraint of trade or commerce . . . between the District of Columbia and any State or States or foreign nations, is hereby declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor . . . .

"Sec. 4. The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations. . . ."

[2] Congress has provided that where a State adopts a "Fair Trade Law" which permits sellers under certain circumstances to make price-fixing agreements with purchasers, such agreements shall not be held illegal under the Sherman Act, 15 U. S. C. § 1. The Fair Trade Laws adopted in 16 States have been invalidated by their state courts on state grounds. H. R. Rep. No. 467, 86th Cong., 1st Sess. 6–7. On June 9, 1959, the House Committee on Interstate Commerce favorably reported a bill which, if passed, would enact a National Fair Trade Practice Act.

[3] 32 Stat. 823, 15 U. S. C. § 29, as amended by § 17 of the Act of June 25, 1948, 62 Stat. 989.

drug retailers. The retailers buy these products from the drug wholesalers or make large quantity purchases directly from Parke Davis. Sometime before 1956 Parke Davis announced a resale price maintenance policy in its wholesalers' and retailers' catalogues. The wholesalers' catalogue contained a Net Price Selling Schedule listing suggested minimum resale prices on Parke Davis products sold by wholesalers to retailers. The catalogue stated that it was Parke Davis' continuing policy to deal only with drug wholesalers who observed that schedule and who sold only to drug retailers authorized by law to fill prescriptions. Parke Davis, when selling directly to retailers, quoted the same prices listed in the wholesalers' Net Price Selling Schedule but granted retailers discounts for volume purchases. Wholesalers were not authorized to grant similar discounts. The retailers' catalogue contained a schedule of minimum retail prices applicable in States with Fair Trade Laws and stated that this schedule was suggested for use also in States not having such laws. These suggested minimum retail prices usually provided a 50% markup over cost on Parke Davis products purchased by retailers from wholesalers but, because of the volume discount, often in excess of 100% markup over cost on products purchased in large quantities directly from Parke Davis.

There are some 260 drugstores in Washington, D. C., and some 100 in Richmond, Virginia. Many of the stores are units of Peoples Drug Stores, a large retail drug chain. There are five drug wholesalers handling Parke Davis products in the locality who do business with the drug retailers. The wholesalers observed the resale prices suggested by Parke Davis. However, during the spring and early summer of 1956 drug retailers in the two cities advertised and sold several Parke Davis vitamin products at prices substantially below the suggested minimum retail prices; in some instances the prices apparently

reflected the volume discounts on direct purchases from Parke Davis since the products were sold below the prices listed in the wholesalers' Net Price Selling Schedule. The Baltimore office manager of Parke Davis in charge of the sales district which included the two cities sought advice from his head office on how to handle this situation. The Parke Davis attorney advised that the company could legally "enforce an adopted policy arrived at unilaterally" to sell only to customers who observed the suggested minimum resale prices. He further advised that this meant that "we can lawfully say 'we will sell you only so long as you observe such minimum retail prices' but cannot say 'we will sell you only if you agree to observe such minimum retail prices,' since except as permitted by Fair Trade legislations [sic] agreements as to resale price maintenance are invalid." Thereafter in July the branch manager put into effect a program for promoting observance of the suggested minimum retail prices by the retailers involved. The program contemplated the participation of the five drug wholesalers. In order to insure that retailers who did not comply would be cut off from sources of supply, representatives of Parke Davis visited the wholesalers and told them, in effect, that not only would Parke Davis refuse to sell to wholesalers who did not adhere to the policy announced in its catalogue, but also that it would refuse to sell to wholesalers who sold Parke Davis products to retailers who did not observe the suggested minimum retail prices. Each wholesaler was interviewed individually but each was informed that his competitors were also being apprised of this. The wholesalers without exception indicated a willingness to go along.

Representatives called contemporaneously upon the retailers involved, individually, and told each that if he did not observe the suggested minimum retail prices, Parke Davis would refuse to deal with him, and that fur-

thermore he would be unable to purchase any Parke Davis products from the wholesalers. Each of the retailers was also told that his competitors were being similarly informed.

Several retailers refused to give any assurances of compliance and continued after these July interviews to advertise and sell Parke Davis products at prices below the suggested minimum retail prices. Their names were furnished by Parke Davis to the wholesalers. Thereafter Parke Davis refused to fill direct orders from such retailers and the wholesalers likewise refused to fill their orders.[4] This ban was not limited to the Parke Davis products being sold below the suggested minimum prices but included all the company's products, even those necessary to fill prescriptions.

The president of Dart Drug Company, one of the retailers cut off, protested to the assistant branch manager of Parke Davis that Parke Davis was discriminating against him because a drugstore across the street, one of the Peoples Drug chain, had a sign in its window advertising Parke Davis products at cut prices. The retailer was told that if this were so the branch manager "would see Peoples and try to get them in line." The branch manager testified at the trial that thereafter he talked to a vice-president of Peoples and that the following occurred:

> "Q. Well, now, you told Mr. Downey [the vice-president of Peoples] at this meeting, did you not, Mr. Powers, [the assistant branch manager of Parke Davis] that you noticed that Peoples were cutting prices?
> "A. Yes.

---

[4] When Parke Davis learned from a wholesaler's invoice that he had filled an order of one of the retailers, Parke Davis protested but was satisfied when the wholesaler explained that this was an oversight.

"Q. And you told him, did you not, that it had .been the Parke, Davis policy for many years to do business only with individuals that maintained the scheduled prices?

"A. I told Mr. Downey that we had a policy in our catalog, and that anyone that did not go along with our policy, we were not interested in doing business with them.

. . . . .

"Q. . . . Now, Mr. Downey told you on the occasion of this visit, did he not, that Peoples would stop cutting prices and would abide by the Parke-Davis policy, is that right?

"A. That is correct.

. . . . .

"Q. When you went to call on Mr. Downey, you solicited his support of Parke, Davis policies, is not that right?

"A. That is right.

"Q. And he said, I will abide by your policy?

"A. That is right."

The District Court found, apparently on the basis of this testimony, that "The Peoples' representative stated that Peoples would stop cutting prices on Parke, Davis' products and Parke, Davis continued to sell to Peoples."

But five retailers continued selling Parke Davis products at less than the suggested minimum prices from stocks on hand. Within a few weeks Parke Davis modified its program. Its officials believed that the selling at discount prices would be deterred, and the effects minimized of any isolated instances of discount selling which might continue, if all advertising of such prices were discontinued. In August the Parke Davis representatives again called on the retailers individually. When interviewed, the president of Dart Drug Company indi-

cated that he might be willing to stop advertising, although continuing to sell at discount prices, if shipments to him were resumed. Each of the other retailers was then told individually by Parke Davis representatives that Dart was ready to discontinue advertising. Each thereupon said that if Dart stopped advertising he would also. On August 28 Parke Davis reported this reaction to Dart. Thereafter all of the retailers discontinued advertising of Parke Davis vitamins at less than suggested minimum retail prices and Parke Davis and the wholesalers resumed sales of Parke Davis products to them. However, the suspension of advertising lasted only a month. One of the retailers again started newspaper advertising in September and, despite efforts of Parke Davis to prevent it, the others quickly followed suit. Parke Davis then stopped trying to promote the retailers' adherence to its suggested resale prices, and neither it nor the wholesalers have since declined further dealings with them.[5] A reason for this was that the Department of Justice, on complaint of Dart Drug Company, had begun an investigation of possible violation of the antitrust laws.

The District Court held that the Government's proofs did not establish a violation of the Sherman Act because "the actions of [Parke Davis] were properly unilateral and sanctioned by law under the doctrine laid down in the case of United States v. Colgate & Co., 250 U. S. 300 . . . ." 164 F. Supp., at 829.

The *Colgate* case came to this Court on writ of error under the Criminal Appeals Act, 34 Stat. 1246, from a District Court judgment dismissing an indictment for violation of the Sherman Act. The indictment proceeded

---

[5] Except that in December 1957, Parke Davis informed Dart Drug Company that it did not intend to have any further dealings with Dart. The latter has, however, continued to purchase Parke Davis products from wholesalers. Thus, Dart Drug cannot receive the volume discount on large quantity purchases.

solely upon the theory of an unlawful combination between Colgate and its wholesale and retail dealers for the purpose and with the effect of procuring adherence on the part of the dealers to resale prices fixed by the company. However, the District Court construed the indictment as not charging a combination by *agreement* between Colgate and its customers to maintain prices. This Court held that it must disregard the allegations of the indictment since the District Court's interpretation of the indictment was binding and that without an allegation of unlawful *agreement* there was no Sherman Act violation charged. The Court said:

"The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell." 250 U. S., at 307.

The Government concedes for the purposes of this case that under the *Colgate* doctrine a manufacturer, having announced a price maintenance policy, may bring about adherence to it by refusing to deal with customers who do not observe that policy. The Government contends, however, that subsequent decisions of this Court compel the holding that what Parke Davis did here by entwining the wholesalers and retailers in a program to promote general compliance with its price maintenance policy went

beyond mere customer selection and created combinations or conspiracies to enforce resale price maintenance in violation of §§ 1 and 3 of the Sherman Act.

The history of the *Colgate* doctrine is best understood by reference to a case which preceded the *Colgate* decision, *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373. Dr. Miles entered into written contracts with its customers obligating them to sell its medicine at prices fixed by it. The Court held that the contracts were void because they violated both the common law and the Sherman Act. The *Colgate* decision distinguished *Dr. Miles* on the ground that the *Colgate* indictment did not charge that company with selling its products to dealers *under agreements* which obligated the latter not to resell except at prices fixed by the seller. The *Colgate* decision created some confusion and doubt as to the continuing vitality of the principles announced in *Dr. Miles*. This brought *United States* v. *Schrader's Son, Inc.*, 252 U. S. 85, to the Court. The case involved the prosecution of a components manufacturer for entering into price-fixing agreements with retailers, jobbers and manufacturers who used his products. The District Court dismissed, saying:

> "Granting the fundamental proposition stated in the Colgate case, that the manufacturer has an undoubted right to specify resale prices and refuse to deal with any one who fails to maintain the same, or, as further stated, the act does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business freely to exercise his own independent discretion as to parties with whom he will deal, and that he of course may announce in advance the circumstances under which he will refuse to sell, it seems to me that it is a distinction without a difference to say that he may do so by the subter-

fuges and devices set forth in the [*Colgate*] opinion and not violate the Sherman Anti-Trust Act, yet if he had done the same thing in the form of a written agreement, adequate only to effectuate the same purpose, he would be guilty of a violation of the law. . . ." 264 F. 175, 184.

This Court reversed, and said:

"The court below misapprehended the meaning and effect of the opinion and judgment in [*Colgate*]. We had no intention to overrule or modify the doctrine of *Dr. Miles Medical Co.* v. *Park & Sons Co.,* where the effort was to destroy the dealers' independent discretion through restrictive agreements." 252 U. S., at 99.

The Court went on to explain that the statement from *Colgate* quoted earlier in this opinion meant no more than that a manufacturer is not guilty of a combination or conspiracy if he merely "indicates his wishes concerning prices and declines further dealings with all who fail to observe them . . ."; however there is unlawful combination where a manufacturer "enters into agreements—whether express or implied from a course of dealing or other circumstances—with all customers . . . which undertake to bind them to observe fixed resale prices." *Ibid.*

The next decision was *Frey & Son, Inc.,* v. *Cudahy Packing Co.,* 256 U. S. 208. That was a treble damage suit alleging a conspiracy in violation of the Sherman Act between the manufacturer and jobbers to maintain resale prices. The plaintiff recovered a judgment. The Court of Appeals for the Fourth Circuit reversed on the authority of *Colgate.* The Court of Appeals concluded: "There was no formal written or oral agreement with jobbers for the maintenance of prices" and in that circumstance held

that under *Colgate* the trial court should have directed a verdict for the defendant. In holding that the Court of Appeals erred, this Court referred to the decision in *Schrader* as holding that the "essential agreement, combination or conspiracy might be implied from a course of dealing or other circumstances," so that in *Cudahy*, "Having regard to the course of dealing and all the pertinent facts disclosed by the present record, we think whether there existed an unlawful combination or agreement between the manufacturer and jobbers was a question for the jury to decide, and that the Circuit Court of Appeals erred when it held otherwise." 256 U. S., at 210.

But the Court also held improper an instruction which was given to the jury that a violation of the Sherman Act might be found if the jury should find as facts that the defendant "indicated a sales plan to the wholesalers and jobbers, which plan fixed the price below which the wholesalers and jobbers were not to sell to retailers, and . . . [that] . . . defendant called this particular feature of this plan to their attention on very many different occasions, and . . . [that] . . . the great majority of them not only [expressed] no dissent from such plan, but actually [cooperated] in carrying it out by themselves selling at the prices named . . . ." 256 U. S. 210–211. However, the authority of this holding condemning the instruction has been seriously undermined by subsequent decisions which we are about to discuss. Therefore, *Cudahy* does not support the District Court's action in this case, and we cannot follow it here. Less than a year after *Cudahy* was handed down, the Court decided *Federal Trade Comm'n* v. *Beech-Nut Packing Co.*, 257 U. S. 441, which presented a situation bearing a marked resemblance to the Parke Davis program.

In *Beech-Nut* the company had adopted a policy of refusing to sell its products to wholesalers or retailers who did not adhere to a schedule of resale prices. Beech-Nut

later implemented this policy by refusing to sell to wholesalers who sold to retailers who would not adhere to the policy. To detect violations the company utilized code numbers on its products and instituted a system of reporting. When an offender was cut off, he would be reinstated upon the giving of assurances that he would maintain prices in the future. The Court construed the Federal Trade Commission Act to authorize the Commission to forbid practices which had a "dangerous tendency unduly to hinder competition or create monopoly." 257 U. S., at 454. The Sherman Act was held to be a guide to what constituted an unfair method of competition. The company had urged that its conduct was entirely legal under the Sherman Act as interpreted by *Colgate.* The Court rejected this contention, saying that "the Beech-Nut system goes far beyond the simple refusal to sell goods to persons who will not sell at stated prices, which in the *Colgate Case* was held to be within the legal right of the producer." *Ibid.* The Court held further that the nonexistence of contracts covering the practices was irrelevant since "[t]he specific facts found show suppression of the freedom of competition by methods in which the company secures the coöperation of its distributors and customers, which are quite as effectual as agreements express or implied intended to accomplish the same purpose." *Id.,* at 455. That the Court considered that the Sherman Act violation thus established was dispositive of the issue before it is shown by the ground taken by Mr. Justice McReynolds in dissent. The parties had stipulated that there were no contracts covering the policy. Relying on his view of *Colgate,* he asked: "How can there be methods of coöperation . . . when the existence of the essential contracts is definitely excluded?" *Id.,* at 459. The majority did not read *Colgate* as requiring such contracts; rather, the Court dispelled the confusion over whether a combination effected by contractual arrange-

ments, express or implied, was necessary to a finding of Sherman Act violation by limiting *Colgate* to a holding that when the only act specified in the indictment amounted to saying that the trader had exercised his right to determine those with whom he would deal, and to announce the circumstances under which he would refuse to sell, no Sherman Act violation was made out. However, because Beech-Nut's methods were as effective as agreements in producing the result that "all who would deal in the company's products are constrained to sell at the suggested prices," 257 U. S., at 455, the Court held that the securing of the customers' adherence by such methods constituted the creation of an unlawful combination to suppress price competition among the retailers.

That *Beech-Nut* narrowly limited *Colgate* and announced principles which subject to Sherman Act liability the producer who secures his customers' adherence to his resale prices by methods which go beyond the simple refusal to sell to customers who will not resell at stated prices, was made clear in *United States* v. *Bausch & Lomb Optical Co.*, 321 U. S. 707, 722:

> "The *Beech-Nut* case recognizes that a simple refusal to sell to others who do not maintain the first seller's fixed resale prices is lawful but adds as to the Sherman Act, 'He [the seller] may not, consistently with the act, go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade.' 257 U. S. at 453. The Beech-Nut Company, without agreements, was found to suppress the freedom of competition by coercion of its customers through special agents of the company, by reports of competitors about customers who violated resale prices, and by boycotts of price cutters. . . ."

*Bausch & Lomb,* like the instant case, was an action by the United States to restrain alleged violations of §§ 1 and 3 of the Sherman Act. The Court, relying on *Beech-Nut,* held that a distributor, Soft-Lite Lens Company, Inc., violated the Sherman Act when, as was the case with Parke Davis, the refusal to sell to wholesalers was not used simply to induce acquiescence of the wholesalers in the distributor's published resale price list; the wholesalers "accepted Soft-Lite's proffer of a plan of distribution by cooperating in prices, limitation of sales to and approval of retail licensees. That is sufficient. . . . Whether this conspiracy and combination was achieved by agreement or by acquiescence of the wholesalers coupled with assistance in effectuating its purpose is immaterial." 321 U. S., at 723. Thus, whatever uncertainty previously existed as to the scope of the *Colgate* doctrine, *Bausch & Lomb* and *Beech-Nut* plainly fashioned its dimensions as meaning no more than that a simple refusal to sell to customers who will not resell at prices suggested by the seller is permissible under the Sherman Act. In other words, an unlawful combination is not just such as arises from a price maintenance *agreement,* express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy.

In the cases decided before *Beech-Nut* the Court's inquiry was directed to whether the manufacturer had entered into illicit contracts, express or implied. The District Court in this case apparently assumed that the Government could prevail only by establishing a contractual arrangement, albeit implied, between Parke Davis and its customers. Proceeding from the same premise Parke Davis strenuously urges that Rule 52 of the Rules of Civil Procedure compels an affirmance of the

District Court since under that Rule the finding that there were no contractual arrangements should "not be set aside unless clearly erroneous." But Rule 52 has no application here. The District Court premised its ultimate finding that Parke Davis did not violate the Sherman Act on an erroneous interpretation of the standard to be applied. The *Bausch & Lomb* and *Beech-Nut* decisions cannot be read as merely limited to particular fact complexes justifying the inference of an agreement in violation of the Sherman Act. Both cases teach that judicial inquiry is not to stop with a search of the record for evidence of purely contractual arrangements. The Sherman Act forbids combinations of traders to suppress competition. True, there results the same economic effect as is accomplished by a prohibited combination to suppress price competition if each customer, although induced to do so solely by a manufacturer's announced policy, independently decides to observe specified resale prices. So long as *Colgate* is not overruled, this result is tolerated but only when it is the consequence of a mere refusal to sell in the exercise of the manufacturer's right "freely to exercise his own independent discretion as to parties with whom he will deal." When the manufacturer's actions, as here, go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, this countervailing consideration is not present and therefore he has put together a combination in violation of the Sherman Act. Thus, whether an unlawful combination or conspiracy is proved is to be judged by what the parties actually did rather than by the words they used. See *Eastern States Retail Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600, 612. Because of the nature of the District Court's error we are reviewing a question of law, namely, whether the District Court applied the proper standard to essentially undisputed facts. See *Interstate*

*Circuit* v. *United States,* 306 U. S. 208; *United States* v. *Masonite Corp.,* 316 U. S. 265; *United States* v. *United States Gypsum Co.,* 333 U. S. 364; *United States* v. *du Pont,* 353 U. S. 586; and also *United States* v. *Felin & Co.,* 334 U. S. 624; *Great Atlantic & Pacific Tea Co.* v. *Supermarket Equipment Corp.,* 340 U. S. 147.

The program upon which Parke Davis embarked to promote general compliance with its suggested resale prices plainly exceeded the limitations of the *Colgate* doctrine and under *Beech-Nut* and *Bausch & Lomb* effected arrangements which violated the Sherman Act. Parke Davis did not content itself with announcing its policy regarding retail prices and following this with a simple refusal to have business relations with any retailers who disregarded that policy. Instead Parke Davis used the refusal to deal with the wholesalers in order to elicit their willingness to deny Parke Davis products to retailers and thereby help gain the retailers' adherence to its suggested minimum retail prices. The retailers who disregarded the price policy were promptly cut off when Parke Davis supplied the wholesalers with their names. The large retailer who said he would "abide" by the price policy, the multi-unit Peoples Drug chain, was not cut off.[6] In thus involving the wholesalers to stop the flow of Parke Davis products to the retailers, thereby inducing retailers' adherence to its suggested retail prices, Parke Davis created a combination with the retailers and the wholesalers to maintain retail prices and violated the Sherman Act. Although Parke Davis' originally announced wholesalers' policy would not under *Colgate* have violated the

---

[6] Indeed, if Peoples resumed adherence to the Parke Davis price scale after the interview between its vice-president and Parke Davis' assistant branch manager, p. 34, *supra,* shows that Parke Davis and Peoples entered into a price maintenance agreement, express, tacit or implied, such agreement violated the Sherman Act without regard to any wholesalers' participation.

46 

 

Sherman Act if its action thereunder was the simple refusal without more to deal with wholesalers who did not observe the wholesalers' Net Price Selling Schedule, that entire policy was tainted with the "vice of . . . illegality," cf. *United States* v. *Bausch & Lomb Optical Co.*, 321 U. S. 707, 724, when Parke Davis used it as the vehicle to gain the wholesalers' participation in the program to effectuate the retailers' adherence to the suggested retail prices.

Moreover, Parke Davis also exceeded the "limited dispensation which [*Colgate*] confers," *Times-Picayune Pub. Co.* v. *United States,* 345 U. S. 594, 626, in another way, which demonstrates how far Parke Davis went beyond the limits of the *Colgate* doctrine. With regard to the retailers' suspension of advertising, Parke Davis did not rest with the simple announcement to the trade of its policy in that regard followed by a refusal to sell to the retailers who would not observe it. First it discussed the subject with Dart Drug. When Dart indicated willingness to go along the other retailers were approached and Dart's apparent willingness to cooperate was used as the lever to gain their acquiescence in the program. Having secured those acquiescences Parke Davis returned to Dart Drug with the report of that accomplishment. Not until all this was done was the advertising suspended and sales to all the retailers resumed. In this manner Parke Davis sought assurances of compliance and got them, as well as the compliance itself. It was only by actively bringing about substantial unanimity among the competitors that Parke Davis was able to gain adherence to its policy. It must be admitted that a seller's announcement that he will not deal with customers who do not observe his policy may tend to engender confidence in each customer that if he complies his competitors will also. But if a manufacturer is unwilling to rely on individual self-interest to bring

about general voluntary acquiescence which has the collateral effect of eliminating price competition, and takes affirmative action to achieve uniform adherence by inducing each customer to adhere to avoid such price competition, the customers' acquiescence is not then a matter of individual free choice prompted alone by the desirability of the product. The product then comes packaged in a competition-free wrapping—a valuable feature in itself—by virtue of concerted action induced by the manufacturer. The manufacturer is thus the organizer of a price-maintenance combination or conspiracy in violation of the Sherman Act. Under that Act "competition not combination, should be the law of trade," *National Cotton Oil Co.* v. *Texas,* 197 U. S. 115, 129, and "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se." United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 223. And see *United States* v. *McKesson & Robbins, Inc.,* 351 U. S. 305; *Kiefer-Stewart Co.* v. *Seagram & Sons, Inc.,* 340 U. S. 211; *Eastern States Retail Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600.

The District Court also alternatively rested its judgment of dismissal on the holding that ". . . even if the unlawful conditions alleged in the Complaint had actually been proved, since 1956 they no longer existed, and [there is] no reason to believe, or even surmise, the unlawful acts alleged can possibly be repeated . . . ." 164 F. Supp. 827, 830. We are of the view that the evidence does not justify any such finding. The District Court stated that "the compelling reason for defendant's so doing [ceasing its efforts] was forced upon it by business and economic conditions in its field." There is no evidence in the record that this was the reason and any such conclusion must rest on speculation. It does not appear even that

Parke Davis has announced to the trade that it will abandon the practices we have condemned. So far as the record indicates any reason, it is that Parke Davis stopped its efforts because the Department of Justice had instituted an investigation. The president of Dart Drug Company testified that he had told the Parke Davis representatives in August that he had just been talking to the Department of Justice investigators. He stated that the Parke Davis representatives had said that "they [knew] that the Antitrust Division was investigating them all over town," and that this was one of their reasons for visiting him. The witness testified that it was on this occasion, after the discussion of the investigation, that the Parke Davis representatives finally stated that if Dart would stop advertising, Parke Davis "would resume shipment, in so far as there was an Antitrust investigation going on." Moreover Parke Davis' own employees, who were called by the Government as witnesses at the trial, admitted that they were aware of the investigation at the time and that the investigation was a reason for the discontinuance of the program. It seems to us that if the investigation would prompt Parke Davis to discontinue its efforts, even more so would the litigation which ensued.

On the record before us the Government is entitled to the relief it seeks. The courts have an obligation, once a violation of the antitrust laws has been established, to protect the public from a continuation of the harmful and unlawful activities. A trial court's wide discretion in fashioning remedies is not to be exercised to deny relief altogether by lightly inferring an abandonment of the unlawful activities from a cessation which seems timed to anticipate suit. See *United States* v. *Oregon State Medical Society,* 343 U. S. 326, 333.

The judgment is reversed and the case remanded to the District Court with directions to enter an appropriate

judgment enjoining Parke Davis from further violations of the Sherman Act unless the company elects to submit evidence in defense and refutes the Government's right to injunctive relief established by the present record.

*It is so ordered.*

Mr. Justice Stewart, concurring.

I concur in the judgment. The Court's opinion amply demonstrates that the present record shows an illegal combination to maintain retail prices. I therefore find no occasion to question, even by innuendo, the continuing validity of the *Colgate* decision, 250 U. S. 300, or of the Court's ruling as to the jury instruction in *Cudahy*, 256 U. S. 210–211.

Mr. Justice Harlan, whom Mr. Justice Frankfurter and Mr. Justice Whittaker join, dissenting.

The Court's opinion reaches much further than at once may meet the eye, and justifies fuller discussion than otherwise might appear warranted. Scrutiny of the opinion will reveal that the Court has done no less than send to its demise the *Colgate* doctrine which has been a basic part of antitrust law concepts since it was first announced in 1919 in *United States* v. *Colgate*, 250 U. S. 300.

I begin with that doctrine and how it was applied by the District Court in this case. In the words of the Court's opinion, *Colgate* held that in the absence of a monopolistic setting, "a manufacturer, having announced a price maintenance policy, may bring about adherence to it by refusing to deal with customers who do not observe that policy." "And," as said in *Colgate* (at 307), "of course, he may announce in advance the circumstances under which he will refuse to sell."

The Government's complaint, seeking to enjoin alleged violations of §§ 1 and 3 of the Sherman Act,[1] in substance charged Parke Davis with having combined and conspired with wholesalers and retailers of its products in the District of Columbia and Virginia, in four respects: (1) with retailers, to fix retail prices; (2) with retailers, to suppress advertising of cut prices; (3) with wholesalers, to fix wholesale prices; and (4) with wholesalers, to boycott retail price cutters. The Company's defense was that the activities complained of simply constituted a legitimate exercise of its rights under the *Colgate* doctrine. The detailed findings of the District Court are epitomized in its opinion as follows:

(1) Parke Davis "had well-established policies concerning the prices at which [its] products were to be sold by wholesalers and retailers, and the type of retailers to whom the wholesalers could re-sell"; [2]

(2) Parke Davis' "representatives . . . notified retailers concerning the policy under which its goods must be sold, but the retailers were free either to do without such goods or sell them in accordance with defendant's policy";

(3) Parke Davis' "representatives likewise contacted wholesalers, notifying them of its policy and the wholesalers were likewise free to refuse to comply and thus risk being cut off by the defendant";

(4) "every visit made by the representatives to the retailers and wholesalers was, to each of them, separate and apart from all others";

(5) "[t]he evidence is clear that both wholesalers and retailers valued [Parke Davis'] business so highly that they acceded to its policy";

---

[1] These are the "restraint of trade," not the "monopoly," provisions of the Sherman Act. See Note 1 of the Court's opinion.

[2] Those "authorized by law to fill or dispense prescriptions."

(6) "there was no coercion by defendant and no agreement with [wholesaler or retailer] co-conspirators as alleged in the Complaint";

(7) as to the Government's contention that proof of the alleged conspiracy "is implicit in (1) defendant's calling the attention of both retailers and wholesalers to its policy, and (2) the distributors' acquiescence to the policy . . . [t]he Court cannot agree to such a nebulous deduction from the record before it."

On these premises the District Court concluded: "Clearly, the actions of defendant were properly unilateral and sanctioned by law under the doctrine laid down in the case of United States v. Colgate & Co., 250 U. S. 300. . . ."

The Court appears to recognize that as the *Colgate* doctrine was originally understood, the District Court's findings would require affirmance of its judgment here. It is said, however, that reversal is required because *Federal Trade Comm'n* v. *Beech-Nut Packing Co.,* 257 U. S. 441, and *United States* v. *Bausch & Lomb Optical Co.,* 321 U. S. 707, subsequently "narrowly limited" the *Colgate* rule. The claim is that whereas prior to *Beech-Nut* it was considered that, fair trade laws apart, resale price maintenance came within the ban of the Sherman Act only if it was brought about by express or implied agreement between the parties—which the Court says meant "contractual arrangements"—*Beech-Nut,* which was carried forward by *Bausch & Lomb,* later established that such agreements or contractual arrangements need not be shown. Recognizing that §§ 1 and 3 of the Sherman Act explicitly require a "contract, combination . . . or conspiracy," the Court says this requirement is satisfied by conduct which falls short of express or implied agreement, if it goes beyond the seller's mere announcement of terms and his refusal to deal with those who will not comply with them. Concluding that the District

Court in the present case mistakenly proceeded solely on the "agreement" view of *Colgate,* it is then said that its findings of fact are not binding on us because they were based on an erroneous legal standard, and that therefore "Rule 52 has no application here."[3]

I think this reasoning not only misconceives the *Beech-Nut* and *Bausch & Lomb* cases, but also mistakes the premises on which the District Court decided this case, and its actual findings of fact.

*First.* I cannot read *Beech-Nut* or *Bausch & Lomb* as introducing a new narrowing concept into the *Colgate* doctrine. Until today I had not supposed that any informed antitrust practitioner or judge would have had to await *Beech-Nut* to know that the concerted action proscribed by the Sherman Act need not amount to a contractual agreement. But neither do I think it would have been supposed that the Sherman Act does not require concerted action in some form. In *Beech-Nut* itself the Court stated the rule to be that a seller may not restrain trade "by contracts or combinations, express or implied," and there found suppression of competition "by methods in which the company secures the coöperation of its distributors and customers, which are quite as effectual as agreements express or implied intended to accomplish the same purpose." 257 U. S., at 453, 455. It is obvious that the "methods" thus referred to were the "coöperative methods" which the Federal Trade Commission had found to exist, for the Court expressly limited the Commission's order to the granting of relief against such methods. *Id.,* 455–456. Far from announcing that no concerted action need be shown, the Court accepted the Commission's factual determination that such action did exist.

---

[3] Rule 52 (a), Fed. Rules Civ. Proc. provides in relevant part: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

Similarly, in *Bausch & Lomb,* the District Court had found that Soft-Lite had entered into "agreements with wholesale customers" to fix prices and boycott unlicensed retailers. 321 U. S., at 717. This Court held that the facts "all amply support, indeed require, the inference of the trial court that a conspiracy to maintain prices down the distribution system existed between the wholesalers and Soft-Lite." *Id.,* 720. The Court reiterated that resale price maintenance could not be achieved "by agreement, express or implied." *Id.,* 721. In rejecting the applicability of the *Colgate* doctrine, it said that none of the cases applying the doctrine "involve, as the present case does, an agreement between the seller and purchaser to maintain resale prices." *Ibid.* It justified the finding of concerted action on the ground that "[t]he wholesalers accepted Soft-Lite's proffer of a plan of distribution by cooperating in prices, limitation of sales to and approval of retail licensees." *Id.,* 723.

The results in *Beech-Nut* and *Bausch & Lomb,* as in all Sherman Act cases, turned on the application of established standards of concerted action to the full sweep of the particular facts in those cases, and not upon any new meaning given to the words "contract, combination . . . or conspiracy." The Court now says that the seller runs afoul of the Sherman Act when he goes beyond mere announcement of his policy and refusal to sell, not because the bare announcement and refusal fall outside the statutory phrase, but because any additional step removes a "countervailing consideration" in favor of permitting a seller to choose his customers. But we are left wholly in the dark as to what the purported new standard is for establishing a "contract, combination . . . or conspiracy."

*Second.* The Court is mistaken in attributing to the District Court the limited view that Parke Davis' activities should, under *Colgate,* be upheld unless they involved some express or implied "contractual arrangement" with

wholesalers or retailers. The Government's complaint specifically charged a "combination and conspiracy" between Parke Davis and its wholesale and retail customers in the areas involved, comprising a "continuing agreement, understanding and concert of action" in the four aspects already noted. *Ante,* p. 50. In its 31 detailed findings of fact the District Court repeatedly emphasized that Parke Davis did not have an "agreement or understanding of any kind" with its distributors, and it concluded that the evidence as a whole did not support the Government's allegations. It determined with respect to each of the four facets of the alleged conspiracy that "there was no coercion" and that "Parke, Davis did not combine, conspire or enter into an agreement, understanding or concert of action" with the wholesalers, retailers, or anyone else. I cannot detect in the record any indication that the District Court in making these findings applied anything other than the standard which has always been understood to govern prosecutions based on §§ 1 and 3 of the Sherman Act.

*Third.* Bearing down heavily on the statement in *Beech-Nut* that the conduct there involved showed more than "the simple refusal to sell," 257 U. S., at 454 (see also *Bausch & Lomb, supra,* at 722), the Court finds that Parke Davis' conduct exceeded the permissible limits of *Colgate* in two respects. The first is that Parke Davis announced that it would, and did, cut off wholesalers who continued to sell to price-cutting retailers. The second is that the Company in at least one instance reported its talks with one or more retailers to other retailers; that in "this manner Parke Davis sought assurances of compliance and got them"; and that it "was only by actively bringing about substantial unanimity among the competitors that Parke Davis was able to gain adherence to its policy."

There are two difficulties with the Court's analysis on these scores. The first is the findings of the District Court. As to refusals to sell to wholesalers, the lower court found that such conduct did not involve any concert of action, but was wholly unilateral on Parke Davis' part. And I cannot see how such unilateral action, permissible in itself, becomes any less unilateral because it is taken simultaneously with similar unilateral action at the retail level. As to the other respect in which the Court holds Parke Davis' conduct was illegal, the District Court found that the Company did not make "the enforcement of its policies as to any one wholesaler or retailer dependent upon the action of any other wholesaler or retailer." And it further stated that the "evidence is clear that both wholesalers and retailers valued defendant's business so highly that they acceded to its policy," and that such acquiescence was not brought about by "coercion" or "agreement." Even if this were not true, so that concerted action among the retailers at the "horizontal" level might be inferred, as the Court indicates, under the principles of *Interstate Circuit, Inc.,* v. *United States,* 306 U. S. 208, I do not see how that itself would justify an inference that concerted action at the "vertical" level existed between Parke Davis and the retailers or wholesalers.

The second difficulty with the Court's analysis is that even reviewing the District Court's findings only as a matter of law, as the Court purports to do, the cases do not justify overturning the lower court's resulting conclusions. *Beech-Nut* did not say that refusals to sell to wholesalers who persisted in selling to cut-price retailers— conduct which was present in that case (257 U. S., at 448)—was a *per se* infraction of the *Colgate* rule, but only that it was offensive if it was the result of cooperative group action. While the Court in *Beech-Nut* and

*Bausch & Lomb* inferred from the aggressive, widespread, highly organized, and successful merchandising programs involved there that such concerted action existed in those cases, the defensive, limited, unorganized, and unsuccessful effort of Parke Davis to maintain its resale price policy[4] does not justify our disregarding the District Court's finding to the contrary in this case.[5]

In light of the whole history of the *Colgate* doctrine, it is surely this Court, and not the District Court, that has proceeded on erroneous premises in deciding this case. Unless there is to be attributed to the Couit a purpose to overturn the findings of fact of the District Court—something which its opinion not only expressly disclaims doing, but which would also be in plain defiance of the Federal Rules of Civil Procedure, Rule 52 (a),

---

[4] The District Court found, among other things, that the efforts of Parke Davis in the District of Columbia and Virginia came about only after some of its competitors had engaged in damaging local "deep price cutting" on Parke Davis products (Fdg. 12); that Parke Davis' sales in those areas constituted less than 5% of the total pharmaceutical sales therein (Fdg. 3); that these efforts followed the legal advice previously given by the Company's counsel (Fdg. 12); that Parke Davis did not have "any regularized or systematic machinery for maintaining its suggested minimum prices as to either retailers or wholesalers" (Fdg. 10); that the entire episode lasted only from July to the fall of 1956, when the Company "in good faith" abandoned all further such efforts (Fdgs. 12, 27); and that since that time retailers in these areas "have continuously sold and advertised Parke, Davis products at cut prices, and have been able to obtain those products from both the wholesalers and/or Parke, Davis itself." (Fdg. 27.)

[5] It may be observed that the facts found by the District Court militate more strongly against violation of the Sherman Act than those which formed the basis of the charge held erroneous by this Court in *Cudahy*, 256 U. S., at 210–211. Although the Court now repudiates what was said in *Cudahy* in this respect, I submit that there is nothing in *Beech-Nut*, *Bausch & Lomb*, or any other case in this Court which justifies this.

and principles announced in past cases (see, *e. g., United States* v. *Yellow Cab Co.,* 338 U. S. 338, 341–342; *International Boxing Club of New York, Inc.,* v. *United States,* 358 U. S. 242, 252)—I think that what the Court has really done here is to throw the *Colgate* doctrine into discard.

To be sure, the Government has explicitly stated that it does not ask us to overrule *Colgate,* and the Court professes not to do so. But contrary to the long understanding of bench and bar, the Court treats *Colgate* as turning not on the absence of the concerted action explicitly required by §§ 1 and 3 of the Sherman Act, but upon the Court's notion of "countervailing" social policies. I can regard the Court's profession as no more than a bow to the fact that *Colgate,* decided more than 40 years ago, has become part of the economic regime of the country upon which the commercial community and the lawyers who advise it have justifiably relied.

If the principle for which *Colgate* stands is to be reversed, it is, as the Government's position plainly indicates, something that should be left to the Congress. It is surely the emptiest of formalisms to profess respect for *Colgate* and eviscerate it in application.

I would affirm.