Robert MARTINDELL, Plaintiff,

v.

NEWS GROUP PUBLICATIONS, INC., Rupert Murdoch, Crescent News Distributors, Inc., Woodhaven News Company, Long Island News Corp., Charles Werner, Robert Dever, and William Teubner, Defendants.

Robert MARTINDELL, Charles Verderosa, John Mandrachia, Bernard Leventhal, John Goncharuk, Richard Carberry, Jack Scaccia, Richard Dennis, Maurice Fox, Charles Flugger, Manny Zuccaro, Joe Rosa, Clifford Rosenberg, Francine Fuhrmann, James Eythe & Joseph Sharnow, Plaintiffs,

v.

NEWS GROUP PUBLICATIONS, INC., Rupert Murdoch, Crescent News Distributors, Inc., Woodhaven News Company, Long Island News Corp., Frank Avitable, Al Von Entrence, John Renke, William Paravella, William Dalton, Frank Sherman, Joseph De Domenico, William Noonan, Richard Johnson, Edward Quinn, Defendants.

Nos. 79 CV 2723, 80 CV 107 (ERN).

United States District Court,
E.D. New York.

Jan. 31, 1984.

Sandback & Birnbaum by Donald H. Birnbaum, Garden City, N.Y., for plaintiffs.

Squadron, Ellenoff, Plesent & Lehrer by Neal M. Goldman, New York City, for defendant News Group.

MEMORANDUM AND ORDER

NEAHER, District Judge.

In these consolidated cases, plaintiffs challenge the legality of a newspaper pub-

lisher's pricing schedule as violative of § 1 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 4 and 15. The following facts are not in dispute.

The plaintiffs distributed copies of the New York Post to home delivery carriers. Until the Fall of 1978, defendant News Group Publications, Inc., the successor to the New York Post Corp., sold the Post to wholesale distributors, defendants Long Island News Corp., Crescent News Distributors, Inc., and Woodhaven News Company, which in turn sold the newspaper to plaintiffs, The Post suggested a home delivery retail price of $.75, raised to $1.00 in May 1978, for a six-day delivery week. The Post claims that seven of the plaintiffs were charging in excess of $1.00 per week by the summer of 1978.

On October 30, 1978 the Post changed its method of distribution. It appointed the wholesalers as agents for delivery to and collection of payment from the plaintiffs and increased the suggested retail home delivery price to $1.25 per week as follows:

"1. The suggested retail price for the Monday through Saturday home delivered issues will be increased to $1.25.

"2. The Price to be charged to each individual Dealer by the New York Post Corporation for the Monday through Saturday issues will be (a) $ .77 to the extent that the total price charged by such Dealer to his home delivery subscribers does not exceed $1.25, plus (b) 60% of the total price in excess of $1.25 charged by such Dealer." Exh. B, letter from News Group Publications to its distributors, in support of defendant's motion *in limine.*

Under this schedule, plaintiffs, who are free to charge any price they desire, split the gross, approximately 60/40, if they charge the suggested retail price or any higher price for the Post. The suggested retail price rose to $1.65 per week by March 1980.

The case is before the Court upon defendant News Group's motion *in limine,*[1] which presents one issue: whether the Post's home delivery pricing schedule is lawful under § 1 of the Sherman Act.

"The traditional framework of analysis under § 1 of the Sherman Act is familiar and does not require extended discussion. Section 1 prohibits '[e]very contract, combination ... or conspiracy, in restraint of trade or commerce.' Since the early years of this century a judicial gloss on this statutory language has established the 'rule of reason' as the prevailing standard of analysis. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 [31 S.Ct. 502, 504, 55 L.Ed. 619] (1911). Under this rule, the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *Per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive. As the Court explained in *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5 [78 S.Ct. 514, 518, 2 L.Ed.2d 545] (1958), 'there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977) (footnotes omitted).

Although News Group contends that its pricing schedule should not be measured by the *per se* rule of illegality, neither party has addressed whether it is "manifestly anticompetitive." They have, instead, disputed whether the pricing schedule constitutes resale price fixing, a practice prohibit-

---

**1.** The motion *in limine* has been described as follows:

"Even in federal practice, where judge functions are far more limited in pre-trial proceedings in jury cases than in our state courts, certain issues are disposed of in limine by the trial judge without jury consideration where a question of law is presented as to whether a plaintiff has a right to claim a particular remedy." *Babineaux v. Pernie-Bailey Drilling Co.,* 261 La. 1080, 262 So.2d 328, 335 (1972).

ed by the Sherman Act. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647–48, 100 S.Ct. 1925, 1927–1928, 64 L.Ed.2d 580 (1980) *(per curiam)*; *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 51 (2d Cir.1980) (cases cited therein).

■ Defendant contends that a similar arrangement has been upheld in *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976). In *Kestenbaum*, the Court found that plaintiff had failed to offer any evidence to show injury attributable to defendant's wrongful price fixing activity. *Id.* at 694. At this juncture, the Court has nothing before it concerning issues of evidence of injury. More importantly, News Group's pricing schedule contains none of the indicia of illegal price fixing.

"[A] case of illegal resale price maintenance is made out when a price is announced and some course of action is undertaken or threatened contingent on the willingness or unwillingness of the retailer to adopt the price. The action need not necessarily fit under the rubric 'coercion', but it must involve making a meaningful event depend on compliance or noncompliance with the 'suggested' or stated price. The dealers in [*United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960)] and [*Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968)] were told that the harassment directed against them would end as soon as they acceded to the manufacturer's price desires. The cancellation of the lease in [*Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964)] was a direct consequence of the refusal to charge the manufacturer's desired price. The other cases adhere to the same pattern. *Cf. Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir.), *cert. denied*, 409 U.S. 1077 [93 S.Ct. 687, 34 L.Ed.2d 665] (1972); *Bowen v. New York News, Inc.*, 366 F.Supp. 651 (S.D.N.Y.1973)." *Butera v. Sun Oil Co., Inc.* 496 F.2d 434, 437 (1st Cir.1974) (footnotes omitted).

In *Butera*, Sun Oil, a gasoline refiner, offered its retailers competitive allowances:

"[T]he CA is not offset against the quantity delivered but rather is credited, after delivery, only against the gallonage the dealer actually sells until such time as a new CA is declared. When that happens, the dealer is notified of the new CA, and meters on the pumps are immediately read, establishing the gallonage sold while the earlier CA was in effect and permitting a final credit to be computed for gasoline sold under that CA. The new CA is applied to gas subsequently pumped." *Id.* at 436.

Under this system, the plaintiff-retailer was no longer able to benefit by using his extra tank capacity to speculate on the market price of gasoline. The Court ruled as follows:

"The dealings between Butera and Sun do not fit within the foregoing pattern. Sun has done nothing, and has threatened nothing, contingent on Butera's adherence to the suggested resale price. [The CA] is applied regardless of Butera's pricing policies ...." *Id.* at 437.

Similarly, under the instant schedule, plaintiffs paid the Post 60% of whatever they charged their customers. To the extent that they must pay a higher percentage of the gross if they charge less than the suggested retail price, their situation resembles that of the motion picture exhibitors in *General Cinema Corp. v. Buena Vista Distribution Co., Inc.*, 681 F.2d 594 (9th Cir.1982):

"General Cinema's complaint focuses on a system used by Buena Vista to determine the amount of rent paid it. The contested system requires an exhibitor to pay either (i) a stated percentage (say, 70%) of a 'minimum per capita amount' (minimum admission price) set in the license agreement, whichever is greater. Thus, if the 'minimum per capita amount' were defined as $3.00, the rent would be a flat rate of $2.10 (per ticket sold) for tickets sold at less than $3.00, and 70% of the ticket price (per ticket sold) for tickets sold at greater than $3.00." *Id.* at 596 (footnote omitted).

\*     \*     \*     \*     \*     \*

"Buena Vista's rental policy contains no elements of coercion that might encourage exhibitors to set any price other than a competitive price. General Cinema argues that it is coerced to raise prices above what it believes are competitive levels because, by charging low prices it must pay a higher percentage of its ticket price in rental fees than those who charge a higher price. But General Cinema fails to explain why the percentage of its ticket price that must be paid in film rental has any effect on where it sets the ticket price. We can see no way in which the different percentage of ticket price that must be paid in film rental could possibly influence exhibitors to set a non-competitive ticket price. In fact, General Cinema seems to admit that the proportion of ticket price that goes to film rentals does not interfere with competitive pricing by admitting that Buena Vista could set its rental fee as a flat dollar amount per ticket regardless of ticket price. The effect of such a system would be identical to that of Buena Vista's challenged system: the rental fee would be a high proportion of the ticket price for those who set low ticket prices, and the rental fee would be a low proportion of the ticket price for those who set high ticket prices. The differing proportion clearly has no illegal effect on exhibitors' pricing decisions under the flat dollar amount system, and General Cinema does not explain how the differing proportion resulting from Buena Vista's system is any different.

"General Cinema's dissatisfaction with Buena Vista's system is clear: General Cinema must pay more in film rental than it would if it paid the same percentage of its ticket price in rental fees as did exhibitors who set high prices. But General Cinema cannot invoke the antitrust laws to demand equal treatment unless it demonstrates that the unequal treatment induces exhibitors to set prices at other than a competitive level. Buena Vista's system does no more to induce exhibitors to set prices at other than a competitive level than a system that charges a flat dollar rental. Such an inducement is insufficient to constitute vertical price fixing." *Id.* at 597–98 (footnote omitted).

News Group's pricing schedule contains no illegal consequence for plaintiffs' failure to charge the suggested resale price.[2]

This case also differs from *Newberry v. Washington Post Co.*, 438 F.Supp. 470 (D.D.C.1977). There, the parties' history of dealing disclosed that the Washington Post had repeatedly employed a contractual provision, which allowed it unilateral adjustment of the price to its news distributors [plaintiffs at bar], to regulate the distributors' profitability. It used that provision to raise the price to a distributor, Newberry, in response to his unauthorized price increase to the readers; thus making an example of Newberry to other distributors. The circumstances of the automatic price increase rendered the Washington Post's punitive motive apparent. *Id.* at 480–82. Here, plaintiffs were not made examples. The new pricing schedule applied equally to all distributors, none of whom had ever received special treatment or pricing considerations based upon their individual markets. Additionally, the Court in *Newberry* allowed for the possibility that the publish-

---

**2.** In *Knutson v. The Daily Review, Inc.,* 548 F.2d 795 (9th Cir.1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977), the Court, although finding the case "close", *id.* at 810, upheld a dual system of pricing designed to maintain territorial restrictions imposed upon a newspaper's distributors:

"Whatever the newspapers' justification for the dual rates, charging a higher rate for newspapers above the amount needed for the territory inhibits extraterritorial sales. Not only does the dealer pay a higher price for additional papers, but he is also likely to incur greater costs in acquiring and serving customers outside his territory. This profit squeeze, resulting from the dual rates, inhibits dealer sales beyond his assigned area.

"Nevertheless, the dual rate structure is not, by itself, adequate to meet the restraint standard of making 'a meaningful event depend upon compliance or non-compliance with the restriction.'" *Id.* at 809 (relying on *Butera, supra*).

er could legitimately share in the benefits of its distributor's price increase, *id.* at 483, a circumstance not before it.

■ Having found the *per se* rule inapplicable, the Court will now turn to the rule of reason. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 24–25, 99 S.Ct. 1551, 1564–1565, 60 L.Ed.2d 1 (1979).

> "[T]he inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.'" *Nat. Society of Professional Engineers v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) (citation and footnote omitted).

The Court must analyze

> "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed. In either event, the purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry." *Id.* at 692, 98 S.Ct. at 1365.[3]

As was explained in *General Cinema Corp., supra,* News Group's pricing schedule does not affect or motivate the plaintiffs' choice of prices any differently than a concededly legal one-tiered system whereby the Post charged a flat rate per newspaper sold. Under either system, the plaintiffs are free to set their own prices and are vulnerable to the attempts of each to undersell the other, *i.e.,* to compete for each others' customers in the same territo-

---

**3.** This standard is similar to *Continental T.V., Inc., supra.* 435 U.S. at 691 n. 17, 98 S.Ct. at 1365 n. 17.

**4.** This analysis leads to the conclusion that the pricing system at issue is not a restraint of trade. Consequently, the Court need not consider News Group's justifications for its use, as supported by affidavits and documentary exhib-

ry and for whatever price the market will bear, as plaintiffs allege occurred here. Such a system promotes rather than stifles competition.[4]

Based upon the foregoing discussion, the Court finds that the pricing schedule at issue is lawful under a rule of reason analysis.

Accordingly, by this Order the Court, as requested by News Group Publication's motion *in limine,* confirms that the "pricing system" adopted for the New York Post's home delivery market is lawful under § 1 of the Sherman Act.

SO ORDERED.

its regarding circulation. The Court also need not consider plaintiffs' allegations, supported thus far only by the complaint, concerning the Post's withdrawal of "perks" or gratuitous dealer supports in the nature of gasoline and transportation. Under the agreement between plaintiffs and the Post, the plaintiffs were responsible for their own support services.