**Gary J. DUNN, individually and as guardian of Steven Dunn, a minor child; and G. Michael Dunn, Plaintiffs-Appellants,**

v.

**PHOENIX NEWSPAPERS, INC.,
Defendant-Appellee.**

No. 83–2024.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 18, 1983.

Decided June 26, 1984.

Kenneth R. Reed, Michael Wischkaemper, Kenneth D. Nyman, Phoenix, Ariz., for plaintiffs-appellants.

Richard A. Segal, Gust, Rosenfeld, Divelbess & Henderson, Phoenix, Ariz., for defendant-appellee.

Before DUNIWAY, TIMBERS,* and SKOPIL, Circuit Judges.

DUNIWAY, Circuit Judge:

This is an antitrust suit brought by newspaper home-delivery carriers against the publisher of two newspapers. The carriers complained that the newspapers violated the Sherman Act, 15 U.S.C. § 1, and parallel state law, Ariz.Rev.Stat.Ann. § 44–1402, by directly signing up home subscribers and engaging in other conduct setting the

---

* The Honorable William H. Timbers, Senior United States Circuit Judge for the Second Cir- cuit, sitting by designation.

price that home subscribers paid to the carriers. The district court rejected the carriers' *per se* violation analysis and, after bench trial, filed detailed findings of fact, and decided for the newspapers under the "rule of reason." The carriers appeal, and we affirm.

## I. FACTS.

Plaintiffs Gary J. Dunn, his minor son Steven Dunn, and G. Michael Dunn were carriers for the *Arizona Republic* and the *Phoenix Gazette,* daily newspapers published by defendant Phoenix Newspapers, Inc. The carriers were independent contractors, not employees of the newspapers. The newspapers did not grant the carriers monopolies or exclusive geographical sales rights. The newspapers set the prices at which they sold papers to the carriers.

The newspapers engaged in various practices that, the carriers say, tended to set the price that home-delivery subscribers would pay the carriers: (1) The newspapers published "suggested retail subscription prices" for home-delivery, as well as newsstand "face" prices, in each copy of the papers. (2) When the newspapers changed the published home-delivery subscription rates, they notified subscribers by prominent notices in the papers. (3) When the newspapers switched from carriers to motor route distributors, they directly notified subscribers of rate increases by form letter. (4) At various times, the newspapers used subscription-boosting practices such as door-to-door, telephone, and direct mail solicitation; newspaper advertisements quoting home delivery subscription rates; and promotional subscription discounts ("Eight-for-Four" and "Eight-for-Eight" plans). The carriers were contractually obligated to deliver the papers to such new subscribers. (Exh. 1, ¶ 9.) (5) The newspapers offered direct plans ("Easy Pay Plan" and "Debit Transfer Plan") under which home-delivery subscribers paid directly to the newspapers at the suggested subscription rates, and the newspapers credited the carriers' accounts on a weekly basis. The carriers were not contractually obligated to

participate in these plans. (*See* Exh. 1, ¶ 8.) (6) The newspapers offered the carriers prepared billing invoices at the published home-delivery subscription rates.

The contractual agreements between the newspapers and carriers did not cover subscription prices, and the newspapers told both the carriers and subscribers that published subscription rates were "suggested retail prices" and that carriers were free to charge whatever prices they wanted. There was no evidence that the carriers ever tried to deviate from the suggested retail subscription price. Consequently, there was no evidence as to what the newspapers' actual response to a price increase by a carrier would have been.

## II. STANDARDS OF REVIEW.

 The parties disagree as to the appropriate standard of review. Findings of fact must be upheld unless they are clearly erroneous. Fed.R.Civ.P. 52(a). Whether the newspapers' practices as found violate the Sherman Act is a question of law, not fact, and is subject to *de novo* review. *See United States v. General Motors Corp.,* 1966, 384 U.S. 127, 141 n. 16, 86 S.Ct. 1321, 1328, n. 16, 16 L.Ed.2d 415. The carriers are wrong in saying that all issues on appeal are issues of law subject to *de novo* review. The newspapers are wrong in saying that all issues on appeal are issues of fact subject to the "unless clearly erroneous" rule.

## III. PER SE VIOLATION.

A. *Agreements between Newspapers and Subscribers.*

 Section 1 of the Sherman Act forbids "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. A manufacturer that suggests resale prices and unilaterally refuses to deal with distributors that do not comply does not violate the statute. *Monsanto Co. v. Spray-Rite Service Corp.,* 1984, — U.S. ——, ——, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775; *United States v. Colgate &*

*Co.,* 1919, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992; *Filco v. Amana Refrigeration, Inc.,* 9 Cir., 1983, 709 F.2d 1257, 1261; *General Cinema Corp. v. Buena Vista Distribution Co.,* 9 Cir., 1982, 681 F.2d 594, 597. Resale price maintenance is illegal only if implemented by contract, combination, or conspiracy. *Albrecht v. Herald Co.,* 1968, 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998; *United States v. Parke, Davis & Co.,* 1960, 362 U.S. 29, 43–44, 80 S.Ct. 503, 511–12, 4 L.Ed.2d 505; *United States v. Bausch & Lomb Optical Co.,* 1944, 321 U.S. 707, 721–23, 64 S.Ct. 805, 812–13, 88 L.Ed. 1024; *F.T.C. v. Beech-Nut Packing Co.,* 1922, 257 U.S. 441, 451–53, 42 S.Ct. 150, 153–54, 66 L.Ed. 307; *Dr. Miles Medical Co. v. Park & Sons Co.,* 1911, 220 U.S. 373, 408, 31 S.Ct. 376, 384, 55 L.Ed. 502.

The carriers do not contend that agreements between the newspapers and themselves, or between the newspapers and other carriers, fixed resale prices. They do argue that the direct payment plans and other agreements between the newspapers and certain subscribers fixed the carriers' resale prices, and that this was *per se* illegal. We reject this argument for two reasons. First, the district court found that the carriers failed to show that agreements between the newspapers and subscribers fixed the prices received by the carriers. Second, even if such agreements set subscription prices, they would not be illegal *per se.*

### 1. *No price-fixing agreements.*

■ The district court found that the direct payment plans did not fix the carriers' prices and that carriers could charge higher or lower rates under these plans. The carriers argue that they were contractually bound to honor "direct payment" and other subscription agreements. This is not what the carrier agreements say. (Exhs. 1–3, ¶ 8.) This is not what the district court found. (Findings & Conclusions ¶ 46; *cf.* ¶ 43.) Carriers were obligated to service *new* subscribers (Exhs. 1–3, ¶ 9.) Although the carriers might have blushed

to explain to their customers why they charged more than the suggested subscription prices, the record does not contradict the district court's finding that the carriers could have charged prices other than the suggested retail subscription prices.

The carriers target the newspapers' subscription promotion plans, but the district court found that these plans, while they did fix prices, were of limited duration, were offered on a sporadic basis, and were not shown to involve the plaintiff carriers or any of their subscribers. The carriers did not show that they ever tried to charge, but were prevented from charging, higher prices under the direct payment or other subscription plans.

Therefore, the district court found that there were no express agreements to fix prices that would support application of the *per se* rules of illegality. The district court further found that there was no implied agreement or combination because the newspapers stayed within permitted bounds of unilateral suggestion and persuasion in setting subscription rates. *See Colgate,* 250 U.S. at 305–06, 39 S.Ct. at 467; *Hanson v. Shell Oil Co.,* 9 Cir., 1976, 541 F.2d 1352, 1355–57; *Gray v. Shell Oil Co.,* 9 Cir., 1972, 469 F.2d 742, 748. The findings are not clearly erroneous.

### 2. *No per se violation.*

■ Price-fixing brought about by contract, combination, or conspiracy is unquestionably *per se* illegal. *Arizona v. Maricopa Medical Society,* 1982, 457 U.S. 332, 347, 102 S.Ct. 2466, 2474, 73 L.Ed.2d 48. But a producer is free to fix and publish a retail price for his product and solicit business at that price. The carriers argue that when the newspapers sign up subscribers for home delivery at specified prices, this is a combination in restraint of trade under the Sherman Act. Clearly, without more, it is not; and it is not *per se* illegal.

The myriad cases that have held resale price maintenance schemes to be *per se* violations have typically involved significantly different fact patterns, such as (1) a

combination between the newspaper and a rival carrier, *e.g., Albrecht v. Herald Co.*, 390 U.S. at 150, 88 S.Ct. at 871; or (2) a combination between the newspaper and the plaintiff carrier, *e.g., Noble v. McClatchy Newspapers*, 9 Cir., 1975, 533 F.2d 1081, 1089; *Blankenship v. Hearst Corp.*, 9 Cir., 1975, 519 F.2d 418, 427–28; *see Albrecht*, 390 U.S. at 150 n. 6, 88 S.Ct. at 872 n. 6; or (3) a combination between the newspaper and a rival newspaper, *e.g., Citizen Publishing Co. v. United States*, 1969, 394 U.S. 131, 135, 89 S.Ct. 927, 929, 22 L.Ed.2d 148.

The carriers rely on the second paragraph of the Supreme Court's footnote in *Albrecht*, 390 U.S. at 150 n. 6, 88 S.Ct. at 872 n. 6:

> Petitioner's amended complaint did allege a combination between respondent and petitioner's customers. Because of our disposition of this case it is unnecessary to pass on this claim. It was not, however, a frivolous contention. See *Federal Trade Commission v. Beech-Nut Packing Co.*, 257 U.S. 441 [42 S.Ct. 150, 66 L.Ed. 307] (1922); *Girardi v. Gates Rubber Co. Sales Div., Inc.*, 325 F.2d 196 (C.A. 9th Cir.1963); *Graham v. Triangle Publications, Inc.*, 233 F.Supp. 825 (D.C.E.D.Pa.1964), aff'd *per curiam*, 344 F.2d 775 (C.A. 3d Cir.1965).

In *Albrecht*, there was a combination between a newspaper, a subscription solicitation firm, and a replacement carrier against an independent carrier who charged more than the suggested retail price. 390 U.S. at 147, 150, 88 S.Ct. 870, 871. The footnote is thus dictum, as is clear from its language. The Court did not say that such a combination is a *per se* violation, but only that the claim was something better than "frivolous."

The cases cited in the *Albrecht* footnote are not helpful. *Beech-Nut* held that resale price maintenance by a food producer, implemented in the course of its dealings with jobbers, wholesalers, and retailers, was an unfair method of competition under § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. *Beech-Nut* did not involve dealings between the producer and retail customers. See 257 U.S. at 447–48, 42 S.Ct. at 152. The only references to "customers" pertain to wholesale buyers. See 257 U.S. at 444, 455, 42 S.Ct. at 151, 155.

*Girardi* involved an alleged conspiracy and agreement between a belt and pulley producer and its distributors, which at trial was confined to a conspiracy between the producer and a rival distributor. 325 F.2d at 198. Neither the holding nor dictum addresses dealings between the producer and retail customers.

In *Graham*, the Third Circuit affirmed the denial of a preliminary injunction without expressing any opinion on the merits. 344 F.2d 775, 776.

### B. Coercion by the Newspapers.

The district court held that the carriers failed to show a "level of coercion sufficient to deprive plaintiffs of their free choice in the context of all the facts of this case." (Findings & Conclusions ¶¶ 39, 95–99.) *See In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 9 Cir., 1982, 691 F.2d 1335, 1343; *General Cinema*, 681 F.2d at 597; *Knutson v. Daily Review, Inc.*, 548 F.2d 795 at 806 (9th Cir.1976); *Hanson*, 541 F.2d at 1357; *Gray*, 469 F.2d at 748. The carriers say that they need not show coercion because express agreements between the newspapers and subscribers set the price received by the carriers. The argument is predicated on the finding of an agreement establishing a *per se* violation, which the district court properly rejected.

The carriers also say that they proved coercion under the standard of *Parke, Davis*, 362 U.S. at 44–45, 80 S.Ct. at 511–512. But in *Parke, Davis* the manufacturer combined with wholesalers to induce price maintenance by retailers. Here the district court did not find that the newspapers coerced carriers who attempted to raise subscription rates. Gary Dunn testified that newspaper employee Dyer said that Dunn would be "off the route" if he raised prices. But the district court

rejected this testimony as "entirely self-serving." (Findings & Conclusions ¶ 68.) There was contrary testimony by newspaper area sales manager Carity, which the trial court chose to believe, that the newspaper routinely told carriers that they could set their own prices. We give due regard to the trial court's judgment of the credibility of the witness. Fed.R.Civ.P. 52(a).

Our decision in *Chelson v. Oregonian Publishing Co.*, 9 Cir., 1983, 715 F.2d 1368, is of no help to the carriers. There, we held that a claim that a newspaper threatened to terminate carriers if they agreed to carry another publisher's advertising circulars could amount to a valid antitrust claim and reversed a summary judgment for the newspaper. No such claim is asserted here, and this case has been tried on the merits and findings have been made against the claims of the carriers.

### C. *Application of the Rule of Reason Analysis.*

The carriers do not try to show that the newspapers intended their subscription practices to restrain trade or injure competition but rather that, if the practices are not illegal *per se* as resale price maintenance, they are presumptively unreasonable because they "operate directly on price." The carriers quote *United States v. Trenton Potteries Co.*, 1927, 273 U.S. 392, 397–98, 47 S.Ct. 377, 379–80, 71 L.Ed. 700. But *Trenton Potteries* involved fixing prices by means of agreements between 23 manufacturers and distributors, which was illegal *per se.* The district court correctly found that there were no such agreements here.

■ Under the rule of reason, the carriers must show either that the purpose of the newspapers' direct dealings with subscribers was to restrain trade or that it actually injured competition. *Calculators Hawaii, Inc. v. Brandt, Inc.*, 9 Cir., 1983, 724 F.2d 1332, 1337–38; *Sherman v. British Leyland Motors, Ltd.*, 9 Cir., 1979, 601 F.2d 429, 449. They have not done this. The district court properly considered un-

der the rule of reason standard: (1) whether the newspapers had a legitimate economic interest in using subscription practices to increase their circulations, (2) whether subscribers benefitted from restrained subscription costs, and (3) whether the carriers would have provided any additional services to subscribers if they had charged higher prices.

### 1. *The finding that subscription solicitation practices did not affect the carriers.*

The carriers argue that this finding was clear error because, as a result of the newspapers' subscription practices, the carriers received only the published home-delivery subscription rates, although they wanted to charge more. But the district court found that the carriers were not adversely affected by the newspapers' practices, because the carriers never tried to charge anything other than the suggested rates. Under the rule of reason, the carriers had the burden of proving that they were affected.

### 2. *The finding that the carriers never attempted to increase prices.*

■ First, the carriers argue that there was uncontroverted testimony by Gary Dunn that the carriers had repeatedly attempted to increase their prices but had been prevented from doing so. Not so. The district court gave greater credence to contrary testimony by newspaper area sales manager Carity. (*See* Findings & Conclusions ¶¶ 52–54.) A reviewing court must give due regard to the trial court's judgment of the credibility of the witnesses. Fed.R.Civ.P. 52(a).

Second, the carriers argue that the newspapers expressly admitted in ¶ 33 of their Proposed Findings of Fact that the carriers had attempted to charge more than the suggested subscription rates. This misconstrues the quoted passage, which referred to Dunn's own testimony regarding his inquiry to his newspaper supervisor about raising prices, and did not concede that Dunn actually attempted to charge his cus-

tomers more than the suggested subscription price.

Third, the carriers argue that there is a legal presumption that home-delivery carriers would increase their prices if they were free to do so, citing *Knutson*, 548 F.2d at 812, as establishing this presumption. But *Knutson* involved an express agreement between carriers to adhere to current subscription rates. Under such circumstances, the carriers could not prove what they would have done in the absence of such agreements, and we recognized a rebuttable presumption that dealers would set prices at the level that maximized profits. Here no agreements required the carriers to adhere to the suggested subscription rates, and thus the *Knutson* rationale does not apply. The district court did not err in requiring that the carriers prove damages.

Without such a presumption, the carriers showed no damages. They did not try to raise prices. The newspapers did not fire any of them for trying to raise prices: Gary Dunn voluntarily quit because the route took too much time and he had problems with delinquent subscription payments; Michael Dunn voluntarily quit; Steven Dunn was fired by the *Arizona Republic* for unrelated reasons, but continues to deliver the *Phoenix Gazette*. None of them suffered injury apart from alleged lost profits. These lost profits were speculative because any increases in price would have caused decreases in circulation, as the carriers stipulated. The net effect on revenues depends on the price elasticity of demand, regarding which there were no findings. (The newspapers' circulation director Martz testified that an increase in subscription rates to the face price of the newspapers might cause a 20 to 25% decrease in circulation.) Thus, the carriers failed to prove damages.

## IV. OTHER ERRORS OF LAW.

### A. *Claim for Injunctive Relief.*

The carriers claim that under the district court's findings, Steven Dunn (who is still delivering papers) was entitled to a permanent injunction barring the newspapers from continuing to violate the antitrust laws by imposing their resale price maintenance program on their independent carriers. Because the district court properly found that there were no such violations, it did not err in denying injunctive relief.

### B. *Pendant State Law Claim.*

The district court treated the federal and state antitrust claims as presenting substantially identical issues of fact and law. Arizona antitrust law expressly incorporates federal court interpretations of federal antitrust law. Ariz.Rev.Stat. Ann. § 44–1412. Without separating the two claims, the district court entered judgment in favor of the newspapers on both. We find no error.

### C. *Attorneys Fees Award.*

The carriers argue that the district court's order improperly awarded attorneys fees to the defendant newspapers. The attorneys fees are like the snakes in Ireland. The judgment does not provide for them.

Affirmed.