Robert **MARTINDELL**, Plaintiff,

v.

**NEWS GROUP PUBLICATIONS, INC.**, Defendant.

Robert **MARTINDELL, Charles Verderosa, John Mandrachia, Bernard Leventhal, John Goncharuk, Richard Carberry, Jack Scaccia, Richard Dennis, Maurice Fox, Charles Flugger, Manny Zuccaro, Joe Posa, Clifford Rosenberg, Francine Fuhrmann, James Eythe, and Joseph Sharnow**, Plaintiffs,

v.

**NEWS GROUP PUBLICATIONS, INC.**, Defendant.[1]

**Nos. 79 CV 2723, 80 CV 107 (ERN).**

United States District Court, E.D. New York.

Nov. 18, 1985.

sole defendant.

Sandback & Birnbaum, Mineola by William Sandback, for plaintiffs.

Squadron, Ellenoff, Plesent, & Lehrer, New York City by Neal Goldman, Stuart Bondell, for defendant.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This is the second round of a controversy between News Group Publications, Inc., publisher of the New York Post ("the Post"), and a group of retail distributors (hereinafter "plaintiffs") who undertook home delivery (by carrier boys) of the Post in areas of Kings, Queens, Nassau, and Suffolk Counties formerly served by the defunct Long Island Press. In the first round the Court granted defendants' motion *in limine*, ruling that on the facts then before it, the 60/40 price split, which applied if the suggested home delivery retail price of $1.25 were to be increased by the retailers, was not illegal price fixing. *See Martindell v. News Group Publications, Inc.*, 580 F.Supp. 330 (E.D.N.Y.1984). The case is again before the Court upon the defendant Post's motion to dismiss pursuant to Fed.R.Civ.P. 41(b).[2] After hearing plaintiffs' evidence contra dismissal and reviewing the exhibits, the following constitutes the Court's findings and conclusions pursuant to Fed.R.Civ.P. 52(a).

**2.** "Fed.R.Civ.P. 41(b) provides that a defendant in a case tried to the Court may move for dismissal at the close of the plaintiff's evidence on the ground that upon the facts and the law the plaintiff has shown no right to relief. In rendering judgment the Court is not to make any special inferences in plaintiff's favor. Rath-

## FINDINGS OF FACT

Ten of the plaintiff retail dealers appeared and testified in opposition to the Post's motion, and an eleventh, Clifford Rosenberg, gave his testimony by deposition. The remaining seven plaintiffs—including Robert Martindell who initiated the action—failed to appear. Essentially, the plaintiffs who appeared welcomed the efforts of the Post to replace the Long Island Press in an area already served by the New York Daily News and the New York Times, but disagreed with and resisted the Post's pricing suggestions designed to attract subscribers for home delivery and increase its circulation as against its better known competitors.

All the plaintiffs who appeared had many years of experience delivering the Long Island Press and were well aware of the problems which caused that paper to fold. All readily acknowledged that had the Post not taken over, their delivery routes would probably have been worthless. Their apparent leader was Richard Dennis, who testified that he was formerly employed by the Long Island Press in purchasing franchise areas until the Post took over, and had his own franchise routes embracing some 2,360 customers on the side. According to Dennis, when the Post took over in March 1979 he became acting section head supervising the franchised dealers. This arrangement was at the direction of Sieg Friedler, who had been a circulation manager for the Long Island Press, and continued until 1981. Dennis received no salary, deriving his income from his own franchise routes.

Following the practice of the Long Island Press, the Post required Dennis and the other retail dealers to enter into a "News Dealer Agreement." see Def.'s Exh. D–1, which Dennis and the others signed in or

er, the Court is to 'weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.'"

*Bertolino v. Italian Line*, 414 F.Supp. 279, 284 (S.D.N.Y.1976) (quoting Wright & Miller, *Federal Practice & Procedure "Civil"* § 2371, at 225 (1971)).

about May 1977. The agreement provided that the Post would designate a distributor who would sell and deliver the newspapers to the news dealer "at such rates as shall be agreed upon, from time to time, between the Distributor and the News Dealer." *Id.* There were three such distributors, whose names appeared in the caption, *viz.*, Crescent News Distributors, Woodhaven News Company and Long Island News Corp. Woodhaven has since gone out of business and Crescent has been merged into Long Island News Corp. Moreover, effective October 30, 1978, the Post undertook to sell the newspaper directly to the retail dealers, although the distributors would "continue to deliver the newspaper [in bulk to the dealers] and collect the payments due as agents for the New York Post Corporation." Def.'s Exhs. A and B.

In an effort to attract former Long Island Press subscribers, the Post in March 1977 initially announced a 75¢ price for six days home delivery. This was half of the daily newsstand price of 25¢ a copy, *i.e.*, $1.50 for the week. From the 75¢ price the retail dealers received 60¢ a copy and the home delivery carriers 15¢. That promotional effort lasted until May 1978 when the Post increased the home delivery price to $1.00, still one-third less than the newsstand price. Def.'s Exh. C. At that juncture, Dennis, Clifford Rosenberg and some of the other plaintiffs decided to add a service charge to the Post's advertised price. Dennis charged home subscribers $1.10 a week, and Rosenberg raised his to $1.15, accompanied by a "NEW YORK POST NEWSLETTER" plaintiff Posa had composed, which stated that it would aid the Post "to continue to print a bigger and better paper." Exh. 8 to deposition of Clifford Rosenberg.

The Post did not sponsor the Rosenberg-Posa letter; however, on October 30, 1978 it notified all dealers in Queens, Brooklyn, Staten Island and Westchester, Nassau and Suffolk Counties that it would sell the Post directly to the dealers, although the distributors would continue to deliver the newspapers in bulk to the dealers and collect payments due as agents for the New York

Post Corporation. Def.'s Exhs. A and B. In the same notices, dealers were advised that "the suggested retail price" for weekday home delivery would be $1.25 and $.35 for the Sunday issue, and that the dealers would be charged $.77 for the weekday issues and $.25 for the Sunday issue, plus 60% of the total price in excess of $1.25 charged by the dealer for the weekday issues. Def.'s Exhs. A and B. The legality of that pricing formula was upheld by this Court in the prior *in limine* proceeding. 580 F.Supp. at 330–31. Dennis, Rosenberg and other plaintiffs continued to increase their home delivery prices above the Post's suggested prices, with the result that a number of customers complained to the Post that they were being overcharged and cancelled their subscriptions. Dennis testified that his circulation dropped from 1,743 newspapers to 1,375 after he raised his price to $1.40 in October 1978. In March 1980, when the Post had raised its home delivery price to $1.65, Dennis raised his price to $1.80, with the result that his circulation further decreased to 555, although a portion may have been due to his sale of some 300 customers to another dealer. In February 1981 he had only 480 customers. The Post did not renew his contract in May 1981, notifying him that he was in violation of his dealer agreement because he was also distributing the "Tonite" edition of the New York Daily News.

Rosenberg testified that when he started with the Post in March 1977 he had 900 to 1,000 customers but lost some 200 to 300 by 1979 when he was terminated. He also complained of pressure from Sieg Friedler, who said Rosenberg might be terminated if he did not drop the service charge. However, he continued to receive delivery of the Post even though he had suffered a serious accident in 1978 which required that he turn over active charge of distribution to his teen-age son. Eventually, Rosenberg's annual contract was not renewed in May 1979. By that time, however, Rosenberg had turned his attention to a new business, selling pretzels to schools in his area.

Plaintiff John Goncharuk distributed the Long Island Press in Levittown, East Meadow, and North Bellmore in Nassau County. He commenced delivery of the Post after the last day of Press publication and was told at a general meeting, where section heads of the Post and Press were present, to charge $.75. There was no discussion of how long this price would last nor mention of changing it. In May 1977 he signed a news dealer contract with the Post. Thereafter, he agreed to charge the suggested price because he was warned that he would lose his district and subsidy if he did not. Over time, circulation declined, which resulted in a cut in the subsidy.

In 1982 Goncharuk raised his price to $2.40 for about 100 customers on a motor route and lost a few customers. There were threats from the Post, with which he is still under contract, to drop the price. Undoubtedly, to discredit this point, Goncharuk was shown Defendant's Exh. UU, a form sent by the Circulation Department to customers who have discontinued service. Apart from printed information relating to the discontinuance, the lower left hand corner bears the following in a red ink stamp,

"HOME DELIVERY STILL
ONLY $1.65
(SUGGESTED PRICE)."

Plaintiff Maurice Fox had been a circulation manager for the Press, operating under a franchise agreement that covered 1700 home subscribers. He was told that the contract with the Post was similar to the contract he had had with the Press. He thought the $.75 introductory price was a bad idea but Friedler told him to charge that price, which he did, or he would have no franchise. When the suggested price went to $1.00, Friedler told him that if he charged $1.10, he would have no contract. As it turned out, Fox raised his price to $1.10 and the Post raised the suggested price to $1.25. At this juncture, he claims the Post agreed to compensate him for any loss of customers and also provided telephone and promotional support. His contract was not renewed in 1981.

Cross-examination disclosed a contradiction between Fox's in-court testimony that he had told the Post's representatives he wanted to charge more and his deposition testimony that he had not done so. When the suggested price rose to $1.00, he admitted that he charged $1.10, resulting in an immediate loss of circulation, and that he had spoken with Dennis who also charged $1.10. When the price rose to $1.25 and Fox charged more, defendant Noonan assertedly informed him that there were no phone orders because he was charging a higher price. Fox's termination occurred by letter of May 5, 1981, in which Frank Sherman, the Post's Home Delivery manager, stated that Fox was in breach of the news dealer agreement because he was also delivering the New York Daily News. The letter also requested payment of arrearages for newspapers delivered since April 9, 1981. Fox never paid any money under the 60/40 system, nor any part of this demand, nor for any papers he received after he had received the termination letter. Later, he met with Post representatives and claims they agreed that $7,000 was due. As with the other plaintiffs, however, evidence of the requisite concerted action is lacking for both Fox and Goncharuk. Fox and Goncharuk charged what they pleased, and Fox invited termination under the news dealer agreement when he began to deliver a competitive newspaper and failed to pay his bills.

The same fate came to plaintiff Joseph Posa in a different manner. From boyhood Posa had handled the Long Island Press, holding a franchise in Flushing and Jamaica in Queens, which he operated continuously except for service in Vietnam. At the time of the Press' demise, Posa had 1600 customers. Like the other former Press dealers, on March 25, 1977 he attended a meeting where Press managers spoke about the arrangement to handle the Post. Although he serviced customers immediately at $.75 per subscription, he did not receive a contract until May 1977. After the price increase to $1.00 in May 1978, he consulted an attorney who advised that he

could charge a higher price. A Post representative warned him, however, that he would be terminated if he did.

During his relationship with the Post, Posa used his own funds to encourage carriers to obtain customers, a practice which Friedler, his former boss at the Press, did not approve. Posa was terminated in May 1979, some 7 months after the October 1978 price increase to $1.25. Prior thereto, he charged $1.40 and claims that he learned that Post employees were delivering the paper to his $1.40 customers for $1.25.

Posa's business was multifaceted, which may explain why he never adhered to the suggested price. From April 18, 1976, he had a contract to deliver the Daily News, which Friedler had permitted. Apparently this contract, like the agreement with the Post, prohibited delivery of another newspaper. Posa never obtained written permission from the Post to deliver another newspaper and never informed them that he also handled The New York Times.

As previously noted, Post circulation was unstable. Posa lost 50% of his customers from March 25, 1977 to May 8, 1977; however, by the end of January 1978 the number was up to 1650. At the $1.10 price he lost some circulation (down to 1291), and a strike caused his customer list to plummet to 555. Afterwards, he regained ground, stabilizing at 1450, which dropped to 1223 after the October 1978 price increase. The bills in evidence confirm Posa's testimony that he never paid the Post under the 60/40 system. Defendant's Exh. AAA, Posa's bill from Long Island for the week ending May 13, 1979, shows current charges of $646.63 and a balance of $3,772.10.

Posa's in-court testimony differed from his deposition testimony in a key respect. In court, representatives of the Post *told* him the price to charge, whereas, at the deposition, they had *suggested* the price to charge. Despite the change in characterization, and perhaps because Posa was not exclusively a Post distributor, he charged what he pleased, was never terminated and did not experience any interruptions in sup-

ply. He also furnished no evidence of concerted action between the Post and anyone which furthered the alleged price fixing scheme.

Post franchise dealer James Marrinan has been in the newspaper distribution business for 20 years. From 1973 until its end in 1977, he was a franchisor for the Long Island Press in Ozone Park and Richmond Hill in Queens. Prior to the Press' last week of publication, the Post ran advertisements soliciting individuals to distribute the paper. Friedler, who was "top man" at the Press, also offered Marrinan and other dealers contracts, but discussed no specific terms.

At the outset of the arrangement, about 1000 customers were lost. Circulation rose thereafter but fell through 1978 as the suggested price increased and, in part, because of a strike in the summer. Marrinan also complained about not receiving telephone orders, a complaint which Friedler redressed, and which the Court does not attribute to any attempt by the Post to coerce a reduction in price. During the relevant periods, Marrinan charged what he pleased and eventually sold his business for reasons unrelated to his relationship with the Post.

Notably, although he complained about having to charge the suggested price from the very beginning, he took on additional routes. The Post's circulation problems, however, stemmed from customer resistance to at best an unfamiliar newspaper which did not publish on Sunday. Inasmuch as Marrinan set his own prices and also experienced no curtailment in supply, his testimony furnishes nothing upon which to base a finding of an antitrust violation.

Plaintiff John Mandrachia sold his route in October 1979, shortly after a strike reduced it from 275 to 197 customers. At the time he signed his contract with the Post, his 1000 Press subscribers became 300 Post subscribers. At first, he received a subsidy in the form of a credit of $15–$20 per week which ended in June or July 1977. Subsequent support in the form of promotional circulars and contests and a token

transportation allowance apparently were ineffective in raising circulation. Although Mandrachia complained that the $.75 price resulted in a loss, his supervisor told him he could not raise it. He abided by the suggested price through part of 1978 but eventually raised his price to $1.25. Despite additional complaints that he needed more money to function, he was told that he could not raise the price. The situation assertedly deteriorated to the point that, prior to the sale of his route, Mandrachia operated a juice delivery route to subsidize the paper route.

Unlike Mandrachia, plaintiff Charles Flugger received no financial help from the Post to service his former Press customers in Flushing and Bayside, Queens. At the outset, he lost 400 customers. At the May 1978 meeting of newsdealers the Post's representatives stated that dealers should charge $1.00 per subscription. Flugger charged $1.05 and lost 75 customers, part of which he attributed to the summer vacation. He believed that the Post had frustrated his efforts to promote the paper after having been supportive during the first year with contests for the carriers and bonuses, which had produced about 25 new customers per week. This number dropped to 8–10 when he was told to reduce the price. When the suggested price rose to $1.25, he charged $1.35, receiving a complaint from defendant Renke. Some time later, he rolled the price back and promotional support was reinstated, and with good reason. The Post's circulars advertised a $1.25 price and thus were not useful to a dealer who charged more than that price.

Like Posa, plaintiff Emanuel Zuccaro received a termination letter from Friedler effective May 15, 1979. Zuccaro had been under the impression that the $.75 price would last only 2 months. He wanted to charge the newsstand price of $1.50 but eventually went to $1.10. At this price he experienced loss of phone orders. When the Post went to $1.25, he went to $1.35 and lost 20–25 customers.

Zuccaro never received any reason for his termination (under the contract none was required), which was not contemporaneous with his failure to abide by the suggested price. The news dealer contract with the Post lasted for one year from May 1977 and was terminable on 30 days notice prior to its expiration. Despite Zuccaro's and other plaintiffs' independent pricing stance, they were not terminated at the Post's first opportunity in May 1978. Had terminations been forthcoming on the heels of failure to follow the pricing structure, or at the first contractually permitted opportunity, the circumstances might then have supported an inference that the news dealer agreement was a pretext designed to enforce price fixing.

Plaintiff Joseph Sharnow is still a Post news dealer. When the Press ceased publication, he had about 1500 customers in Roslyn and Williston Park in Nassau County. He testified that the circulation employees from the Press assumed the same responsibilities at the Post. At the beginning, he received a subsidy which the Post eventually reduced, in part because the Post published only six days per week, whereas the Press had published seven days per week. The subsidy was, in part, an inducement to join the Post instead of the News at an income level similar to what Sharnow had enjoyed while a Press dealer.

While the Post paid the rent for his office, he had to raise the price from $.75 to $.90 and eventually $1.00 to cover transportation for the Roslyn customers because in that area he delivered the papers by car. He also received promotional support and still receives $189 per week for transportation expenses. After the 60/40 system began, he charged $1.50 to the car-delivered customers, and under the plan, experienced no decrease in earnings. Over time he has purchased routes from other dealers or acquired abandoned routes.

According to Sharnow, circulation in these Long Island communities was a problem because the Post was essentially a New York City newspaper. He understood

that when he had a "foot in the door" he could raise the price. It is difficult, however, if not impossible, to discern if that point was ever reached based upon defendant's Exh. LL–1, a table showing the number of newspapers Sharnow purchased per week for his routes from 1977–81. That matter aside, he passed along transportation expenses to the customers, who received delivery by automobile, a practice which did not and has not resulted in termination despite the Post's payment of a transportation subsidy.

Having carefully considered the testimony of the several plaintiffs and the exhibits in evidence, bearing in mind the self-serving motivations of some of the plaintiffs in light of the death of Sieg Friedler, and the Post's substantial counterclaims for newspapers delivered and not paid for, the Court finds that the Post, although it suggested a resale price, did not coerce its retail distributors to charge that price.

### Conclusions of Law

■ The Post's withdrawal and reinstatement of promotional support coincident with the news dealers' changes in price cannot be said to be coercion under the law or circumstances. The support was not contractually required. Moreover, because the Post's promotional campaign/advertising was lawful, *i.e.*, not in violation of the antitrust laws, logic dictates that failure to furnish promotional support to endeavors which undermined that lawful advertising also did not violate the antitrust laws.

On the basis of the foregoing, the Court finds no concerted action between the Post and its distributors, as charged in the complaint, which furthered the Post's alleged price fixing activities. *See Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984).

Unlike *Northwest Publications, Inc. v. Crumb*, 752 F.2d 473 (9th Cir.1985), the plaintiffs' dealership contracts with the Post do not contain a price fixing provision.[3]

"One evil of maximum price-fixing is that it substitutes the seller's judgment for market forces. It may also prevent the dealer from furnishing optimal services, and it may channel distribution through large or specifically advantaged dealers."

*Id.* at 475.

■ In this case, plaintiffs' judgment as sellers was not substituted for market forces. Each time retail distributors charged a price in excess of the suggested price, the Post continued service and eventually raised the suggested price above the price the dealers had been charging. These circumstances hardly compel a finding that the Post's threats of termination, assuming the credibility of the evidence of those threats, secured adherence to a suggested resale price, as is required to sustain an antitrust violation. *See Reborn Enterprises Inc. v. Fine Child Inc.*, 590 F.Supp. 1423, 1439 (S.D.N.Y.1984), *aff'd* 754 F.2d 1072 (2d Cir.1985) (per curiam). While there can be little doubt of the causal connection between the Post's advertisement of a home delivery price and the complaints the plaintiffs received from customers who felt they were being overcharged, such activity merely allows market forces to operate based upon the knowledge of the consumer.

"Coercion in the vertical price fixing context is actual or threatened affirmative action, beyond suggestion or persuasion, taken by a defendant in order to induce a plaintiff to follow the defendants' prices."

*Bender v. Southland Corp.*, 749 F.2d 1205, 1213 (6th Cir.1984) (citations omitted). The antitrust laws do not prohibit the undoubtedly persuasive conduct of a manufacturer suggesting a price to the consumer for which the product should be available. *Jack Walters & Sons Corp. v. Morton Bldg. Inc.*, 737 F.2d 698, 707–08 (7th Cir. 1984) (discussion therein); *Dunn v. Phoe-*

---

**3.** The dealer contracts also contain no requirement that plaintiffs pass on any price breaks to the subscriber. *See AAA Liquors, Inc. v. Joseph E. Seagram & Sons*, 705 F.2d 1203, 1206 (10th Cir.1982), *cert. denied*, 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983).

*nix Newspapers, Inc.*, 735 F.2d 1184, 1187 (9th Cir.1984). As in *Dunn*, the plaintiffs could have and did charge prices other than the suggested retail price.[4]

After considering the testimony and exhibits, the Court concludes from the credible evidence that: (1) Defendant engaged in no concerted activity which violated § 1 of the Sherman Act, and (2), while the Post suggested a resale price, the plaintiffs were not coerced to charge that price. Accordingly, judgment is directed for the defendant, and the complaint is dismissed.

SO ORDERED.

---

**4.** At oral argument on this motion, defendants contended that the instant case is a mirror image of *Dunn;* that the Post had done nothing more than the activity that had passed antitrust scrutiny in that case. Plaintiffs merely responded that *Jack Walters* and *Dunn* are not from this circuit and therefore not binding precedent. They offered no authority, however, which suggests that those cases would not be persuasive in this circuit, or should not be applied to the facts of this case, or contain statements of law contrary to established antitrust principles.